## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| RESOLUTE FOREST PRODUCTS, INC. 111 Duke Street, Suite 5000, Montréal, Québec H3C 2M1, Canada, <br><br> Plaintiff, <br><br> vs. <br><br> UNITED STATES DEPARTMENT OF AGRICULTURE, TOM VILSACK, Secretary of Agriculture, 1400 Independence Ave., S.W. Washington, DC 20250 <br><br> Defendant | Civil Action No. 1:14-cv- 2103 |

## **COMPLAINT**

## **INTRODUCTION**

1.     This action contests the constitutionality of the Commodity Promotion, Research and Information Act of 1996 ("CPRIA"), 7 U.S.C. §§ 7411-7425, which authorizes the Secretary of Agriculture to establish agricultural commodity marketing programs, or "checkoff programs," and contests the conformity of the checkoff program for softwood lumber with the CPRIA and the requirements of the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701-706.

2.     Checkoff programs impose on producers and importers of agricultural commodity products mandatory tax assessments to be used for generic marketing of the product.  Familiar checkoff marketing slogans include "Beef, it's what's for dinner" and "Milk, it does a body good."

1

3.      Checkoff programs have presented numerous legal problems.  Programs created under statutes similar to the CPRIA have been challenged on First Amendment grounds in cases that have reached the Supreme Court.  Most recently, in *Johanns v. Livestock Marketing Association*, 544 U.S. 550 (2005), the Court emphasized that the government, and not private entities, must be responsible for the control and messaging of checkoff programs' promotional campaigns in order for them to comply with the First Amendment's prohibition on compelled speech.

4.      The CPRIA and its application in this case present different problems under the U.S. Constitution and the APA but with similar concerns regarding the role of private parties in checkoff programs.

5.      Plaintiff, Resolute Forest Products, Inc. ("Resolute"), challenges the CPRIA as defective on its face because it effects an unconstitutional delegation of power to private entities in continuing established checkoff programs.

6.      Resolute also contests the application of the CPRIA by the U.S. Department of Agriculture ("USDA") and USDA Secretary Tom Vilsack to the establishment of a "Softwood Lumber Research, Promotion, Consumer Education and Industry Information" checkoff program, 76 Fed. Reg. 46185 (USDA Aug. 1, 2011), as unconstitutional.

7.      USDA, through its Agricultural Marketing Service ("AMS"), has abdicated to private industry groups the Executive Branch authority to establish and maintain checkoff programs.  AMS allowed a private industry group of fewer than twenty lumber companies to draft the governing regulatory terms of the Softwood Lumber Checkoff program, decide which companies would be eligible to vote whether to establish the

program, and which companies would be subject to paying annual assessments.  The

Secretary, through AMS, violated the Appointments Clause and the non-delegation

doctrine by transferring the decision of whether to establish the Softwood Lumber

Checkoff program to private lumber companies voting in a referendum, rather than

exercising the Secretary's own discretion as required by the Constitution and the

CPRIA.

8.      Resolute also challenges USDA's administration of the referendum on the

Softwood Lumber Checkoff,  which was an essential prerequisite to the establishment of

a program, as violative of the CPRIA and APA:

a.  The parameters for eligibility to vote in the referendum were not set in

accordance with plain statutory terms contained in the CPRIA.

b.  USDA misled the public regarding the number of softwood lumber companies

actually permitted to vote in the referendum, which contradicted statements

published by the agency in the Federal Register before and after the

referendum was held.

c.  AMS knowingly allowed the select group of lumber companies who were

campaigning for the checkoff program to disseminate material misinformation

among referendum voters.

d.  AMS failed to conduct the referendum in accordance with Office of

Management and Budget guidelines and professional survey collection

standards to control for response bias.

e. AMS treated Notice and Comment rulemaking as a vote and delegated to commenters decision-making authority over whether USDA would proceed to a referendum.

f. AMS concluded that it was constrained by the CPRIA to proceed with a checkoff program supported by a majority of referendum participants, regardless whether that program would be consistent with and effectuate the purposes of the CPRIA, as the statute requires.

9. Resolute petitioned for relief on these claims in proceedings before a USDA Administrative Law Judge and a USDA Judicial Officer (acting for the USDA Secretary), both of whom denied Resolute's petition.

10. Resolute seeks declaratory relief holding the CPRIA unconstitutional on its face and as applied by USDA with respect to the Softwood Lumber Checkoff.  Resolute also seeks review of the Secretary's ruling on Resolute's petition and an order holding that USDA's enactment and implementation of the Softwood Lumber Checkoff violates the APA because it was arbitrary, capricious, an abuse of USDA's discretion, and otherwise not in accordance with law.

## JURISDICTION AND VENUE

11. This action arises under the United States Constitution; the CPRIA (7 U.S.C. §§ 7411-7425); and the APA.

12. This Court has subject-matter jurisdiction under 28 U.S.C. § 1331 because this case arises under the Constitution and U.S. federal law.

13. In addition, 7 U.S.C. § 7418(b) provides:

The district court of the United States for any district in which a person
who is a petitioner … resides or carries on business shall have jurisdiction
to review the final ruling on the petition of the person, if a complaint for
that purpose is filed not later than 20 days after the date of the entry of the
final ruling by the Secretary ….

14.     Plaintiff, Resolute, petitioned USDA for relief from the Softwood Lumber

Order.  Resolute conducts business within the District of Columbia, as its softwood

lumber and paper products are sold within the District.

15.     Resolute's lumber is sold through distributors to "big box" home repair

stores in Washington D.C., and Resolute has paper supply agreements with local

customers, including *The Washington Post* and *National Geographic*.

16.     Resolute's officers meet regularly with American Forest Products and

Paper Association representatives and U.S. government officials in the District

regarding regulatory and legislative issues.

17.     The final ruling of the Secretary was entered on November 26, 2014, a

copy of which is attached as Exhibit A.  This Complaint is being filed within 20 days of

that ruling and therefore is timely filed.

## THE PARTIES

18.     Plaintiff, Resolute, is an American company, incorporated under the laws

of Delaware, with significant investments in the Canadian production of softwood

lumber, paper, and other forest products.  Resolute owns or operates twenty-one pulp

and paper mills and twenty-two wood products facilities located in the United States,

Canada, and South Korea.  Resolute's principal place of business is in Canada (111

Duke Street, Suite 5000, Montréal, Québec H3C 2M1), where the majority of Resolute's

sawmills are located.

19.     Defendant, the United States Department of Agriculture ("USDA"), is an agency of the United States Government.

20.     Defendant Tom Vilsack is the Secretary of Agriculture ("the Secretary"), and is sued in his official capacity.  The Secretary is charged with administering the Commodity Promotion, Research and Information Act of 1996 (the "CPRIA"), which provides the stated legal authority for the Softwood Lumber Checkoff program.

## BACKGROUND

21.     The CPRIA provides a general framework for the creation of agricultural commodity marketing programs financed by commodity producers and importers and administered by the USDA's AMS.  These programs rely on the government's power to enforce the payment of checkoff assessments on the domestic shipment and importation of covered commodities.

22.     To ensure that producers and importers of a commodity generally support the marketing funded by their assessments, a core feature of the CPRIA that is shared by other statutes establishing commodity marketing programs, private parties subject to the assessment must approve a program by a referendum vote.

23.     Program Initiation And Termination.  The CPRIA authorizes the Secretary to issue marketing orders, particularly in response to requests by associations representing producers of a particular commodity, where the Secretary determines that such orders are "consistent with and will effectuate the purpose of the [CPRIA]."  7 U.S.C. §§ 7413(a), (c).  Each order must be approved by a referendum of producers and importers of the commodity, § 7417, and must be terminated should the referendum vote fail. § 7421(a).

24.     Each marketing order establishes a board of industry members who must be appointed by the Secretary.  § 7414(b).

25.     The board has the power and duty "to administer the order" and "to develop and carry out generic promotion, research, and information activities relating to the agricultural commodity covered by the order,"  §§ 7414(c)(1), (5), but the board's activities are subject to the limitation that they must be approved by the Secretary. § 7414(e)(1).  The Secretary also must approve all expenditures and any contracts proposed by the board.  §§ 7414(e)(2), 7414(f).

26.     <u>The Referendum Requirement</u>.  The Secretary must conduct a referendum "[f]or the purpose of ascertaining whether the persons covered by an order [*i.e.,* those subject to checkoff assessments] favor the continuation, suspension, or termination of the order" within three years after the creation of a marketing order.  7 U.S.C. § 7417(b).

27.     The Secretary may opt to conduct a referendum prior to the institution of a marketing order; when he does, he may delay the mandatory referendum to seven years after the creation of the program.  § 7417(a)(1).

28.     The Secretary also may conduct a referendum "at any time"—that is, without a request by the board or those paying checkoff assessments—and must conduct one at the request of the board established by the marketing order or at the request of 10 percent of those subject to the checkoff.  §§ 7417(c), (d).

29.     Voting in a referendum may be measured by the majority of voters, votes representing the majority of the volume of the commodity, or both (a majority of voters and a majority of volume).  § 7417(e).

30. The Secretary must abide by the results of a referendum in which the private industry disapproves a marketing order. When an order "is not favored by persons voting in a referendum," he must terminate it. § 7421(a).

31. The CPRIA does not provide that a referendum approving a marketing order is binding on the Secretary. As described above, the Secretary may only issue an order that he "determines…is consistent with and will effectuate the purpose of [the Act]." § 7413(c). In addition, the CPRIA authorizes the Secretary to terminate a marketing order outside of the referendum process when the Secretary finds that it "obstructs or does not tend to effectuate the purpose of this [Act]." § 7421(a).

32. AMS officials, speaking on behalf of the Secretary, have testified under oath that USDA has interpreted the CPRIA as requiring the Secretary to establish and administer any program that has been approved by referendum, irrespective of whether he determines that the program is consistent with and will effectuate the purpose of the CPRIA. USDA does not consider the Secretary to have discretion to do otherwise. USDA has observed the outcome of the checkoff referendum to be a determinative "operative event" that requires the agency to "go with the vote."

33. AMS practice with checkoff programs approved under the CPRIA conforms to this testimony.

34. <u>The Softwood Lumber Order</u>. Promulgated under the authority of the CPRIA, the Softwood Lumber Order establishes a "Softwood Lumber Research, Promotion, Consumer Education and Industry Information" program, 76 Fed. Reg. at 46185, financed by an assessment on softwood lumber domestic manufacturers and importers.

8

35.     The Softwood Lumber Order is a federal regulation.  The final rule to implement the Softwood Lumber Checkoff program was published in the Federal Register on August 2, 2011. 76 Fed. Reg. 46185 (August 2, 2011).  *See* 7 C.F.R. §§ 1217.1 et seq.

36.     The declared purpose of the Order is to "strengthen the position of softwood lumber in the marketplace, maintain and expand markets for softwood lumber, and develop new uses for softwood lumber within the United States."  76 Fed. Reg. at 46190.

37.     Marketing program activities intended to meet that purpose are administered by the board of private industry members, but the Secretary is supposed to exercise ultimate authority over all programmatic activities and approve all expenses.

38.     The Softwood Lumber Board's research and promotional programs are financed by an assessment of 35 cents per thousand board feet of softwood lumber shipped within or imported into the United States.  7 C.F.R. § 1217.52(b).

39.     Manufacturers and importers dealing in less than 15 million board feet per year are exempt from the assessment.  *Id.*  The Board may recommend that the Secretary seek to increase the assessment to up to 50 cents per thousand board feet, which change would be subject to rulemaking.  7 C.F.R. § 1217.52(c).

40.     Finally, the Order, which is at variance with the statute, provides that it "shall not become effective" unless

> "approved by a majority of domestic manufacturers and importers voting in the referendum who also represent a majority of the volume of softwood lumber represented in the referendum."

7 C.F.R. § 1217.81(a).  The statute, by contrast, provides that "An order may provide for its approval in a referendum -- (2) by persons voting for approval who represent *a majority of the volume of the agricultural commodity*; or (3) by a majority of those persons voting for approval who also represent *a majority of the volume of the agricultural commodity*," 7 U.S.C. § 7417(e) (emphases added), not a "majority of the volume of the agricultural commodity *represented in the referendum*" as stated in the Order composed by the group of companies and adopted by the Secretary.

41.     The CPRIA provides that the referendum is conducted "among persons to be subject to an assessment … who, during a representative period determined by the Secretary, engaged in the production or handling of the agricultural commodity covered by the order; or the importation of the agricultural commodity."  7 U.S.C. § 7417(a)(1), (b)(1).

42.     Anyone initially expected not to pay the assessment because of an exemption could be excluded from an initial referendum, although the statute limits exemptions to "*de minimis*" quantities of the agricultural commodity.  7 U.S.C. § 7415(a).  Thus, the exemption should have minimal effect on persons otherwise expected to vote.

43.     Tracking the CPRIA, the Order provides that the Secretary "shall suspend or terminate" the marketing program if it is rejected in a referendum vote or if it "obstructs or does not tend to effectuate the purposes of the CPRIA."  7 C.F.R. § 1217.82(a).

44.     <u>The Campaign For A Softwood Lumber Checkoff</u>.  The softwood lumber marketing order was drafted and proposed by the "Blue Ribbon Commission for

Checkoff" ("BRC"), a self-appointed committee of executives of softwood lumber producers and importers that has its origins in the 2006 Softwood Lumber Agreement between the United States and Canada.

45.     After receiving a proposal for the Softwood Lumber Checkoff from the BRC, USDA announced in an official press release that it would proceed to a referendum if a majority of comments filed in the formal notice and comment period favored the program.

46.     Fifty-five comments were submitted in response to the notice, most of which were submitted by members of the BRC.  In some cases, members of the BRC submitted more than one comment in favor of the checkoff.

47.     At the hearing, USDA officials conceded that they counted favorable comments and followed the outcome of that count.

48.     Notice and Comment proceedings are not a vote, nor an election.  The purpose of Notice and Comment is not to determine a majority for or against a proposed rule.

49.     USDA officials, eliminating "duplicates," did not recognize that members of the proponent group BRC sometimes submitted more than one supporting comment, in the guise of different official identities.

50.     USDA officials treated conditional comments – comments that supported the program only if changes were made – as "neutral" or supporting, notwithstanding that the changes demanded to the proposed rule generally were not made in the final rule when the referendum was conducted.

51.     By declaring in a press release that it would count the favorable

submissions seeking a majority in favor, USDA effectively advised the proponent group

not to encourage participation in the Notice and Comment process while members of

the proponent group participated actively and sometimes more than once.

52.     USDA decided, on the basis of the number of favorable comments it had

received, to proceed with a referendum.

53.     The BRC undertook a campaign among industry members to bolster

support for the marketing program in advance of the referendum.

54.     The Administrative Law Judge and the Judicial Officer both recognized

that "promotional materials prepared and distributed by the Blue Ribbon Commission, a

proponent group, contained statements that are wrong."  Ex. A at 25.

55.     The BRC repeatedly stated in its communications to industry members

that the program would rely on the U.S. Government to assure funding stability through

the checkoff assessment, but would be governed by industry.

56.     The BRC and other proponents of the marketing program told prospective

referendum participants that the industry would, in fact, control any checkoff-funded

marketing program established under the CPRIA, despite that the CPRIA itself, as well

as governing legal precedent, preclude such industry control and require that the

government control all programmatic activities.

57.     Proponents of the order systematically and for a sustained period of time

misrepresented the workings of the proposed Softwood Lumber Order to prospective

referendum participants, telling them that the Softwood Lumber Checkoff program

would not be run by USDA nor be controlled by the U.S. government, but rather would be self-governed by private industry.

58.     The BRC claimed that the board of industry representatives would decide how and where to spend the assessments collected and the nature of the messages advertised under the program.

59.     USDA also was complicit in the BRC's misinformation campaign among voters about the Softwood Lumber Checkoff program.

60.     USDA knew that the BRC was devoting substantial resources and efforts to promote the checkoff and to lessen opposition among other industry members.

61.     USDA knew that the BRC claimed the program would be controlled and run by industry and not by USDA, but did not correct the BRC's misrepresentations nor advise them to stop misconstruing the checkoff as a private industry-controlled program.

62.     The Secretary was aware that referendum participants were being misled by BRC misrepresentations.  Before the referendum began, on April 27, 2011, the Petitioner's President and Chief Executive Officer, Richard Garneau, informed USDA's Research and Promotions Branch that the promotion of the checkoff in Canada had been misleading.  On June 10, 2011, Resolute informed the Secretary by letter, with evidence, that the recently-completed vote had been tainted by fraud and that participants had been misinformed of the true nature of the program.

63.     Despite this unrebutted information, the Secretary chose to accept the referendum vote as the means of "ascertaining whether the persons to be covered by an order favor the order going into effect." 7 U.S.C. § 7417.

64.     Subsequent to the issuance of the Softwood Lumber Order, the Secretary appointed nearly all of the BRC members to the Softwood Lumber Board.

65.     <u>Companies Deemed Eligible To Vote</u>.  According to USDA, there were 595 domestic manufacturers and 883 importers of softwood lumber (1,478 manufacturers or importers in total).  All of them potentially would pay assessments on the softwood lumber that they shipped or imported.

66.     At the request of the BRC, USDA adopted a 15 million board foot exemption in the proposed order.  Only those companies above that volume threshold— those that would pay assessments on their softwood lumber shipments—would be allowed to vote as to whether there should be a program and a tax assessment to fund it.

67.     In the Proposed Rules, USDA stated that "about 363 domestic manufacturers and 103 importers would pay assessments under the Order."  76 Fed. Reg. 22757, 22767 (April 22, 2011).  USDA reached this figure by excluding 232 domestic manufacturers and 780 importers who were believed to produce or ship 15 million board feet or less annually.  *Id.*

68.     Even after USDA had winnowed the potential voters based on the exemption chosen by the BRC, USDA did not send ballots to the total number of domestic manufacturers and importers that it claimed in the Proposed Rules would be eligible.

69.     When USDA conducted the referendum from May 23 through June 10, 2011, it sent referendum ballots to only 311 domestic manufacturers and importers,

rather than the 466 companies whom it estimated would pay assessments under the Order as indicated in the April 22, 2011 Proposed Rules.

70.    USDA did not publish the fact that it sent ballots to significantly fewer companies who would pay assessments under the order than originally indicated in the Proposed Rules.  Instead, in the Final Rule published on August 2, 2011, USDA repeated that 363 domestic manufacturers and 103 importers (466 manufacturers and importers in total) would pay assessments under the Order.  76 Fed. Reg. 46185, 46190 (Aug. 2, 2011).

71.    USDA misled the public because, contrary to the August 2, 2011 Federal Register notice, it sent only 311 ballots to eligible voters. The actual number of ballots distributed was not published voluntarily by USDA in the Federal Register or otherwise. Rather, it was obtained through a Freedom of Information Act request.

72.    USDA has not explained what happened to 155 of the voters whom, in the Federal Register notices, USDA had deemed eligible to vote.

73.    The unexplained gap between the 311 ballots sent and the 466 reported before and after the referendum is meaningful because the final vote in the referendum was 107 in favor to 52 against—a difference of only 55 votes with an additional 155 voters apparently eligible but excluded.

74.    USDA's application of the 15 million board foot shipment threshold dramatically changed the pool of voters so that domestic manufacturers outnumbered importers by a three-to-one ratio (363 domestic manufacturers to only 103 importers), in contrast to the original figures by which importers significantly outnumbered domestic producers (883 importers to 595 domestic producers).

15

75.    The BRC advised USDA that approximately 200 companies would be exempt through application of the 15 million board foot threshold it chose.

76.    Information obtained from USDA under the Freedom of Information Act revealed that USDA mailed only 311 referendum ballots, and only 173 (56 percent) were returned.  USDA considered 159 of the ballots valid.  107 of the ballots deemed valid were cast in favor of the checkoff and 52 were counted as opposed.

77.    These 159 ballots determined the establishment of a Softwood Lumber Order potentially applicable to approximately 1,487 manufacturers or importers of softwood lumber.

78.    USDA reported that the 107 affirmative ballots accounted for 80 percent of volume of the 173 voting, but did not reveal what percentage of the overall volume of all shipped softwood lumber was represented in the vote.

79.    AMS rationalized that the 15 million board foot threshold meant exempting small businesses, thereby relieving them of an undue burden, but AMS had found that businesses producing or shipping under 25 million board feet were small businesses and, therefore, should have been exempt.

80.    The BRC reported that it could not raise enough money for the program it desired if it were to exempt all businesses under 25 million board feet.  Consequently, AMS included within the order businesses between 15 and 25 million board feet, notwithstanding that they were "small" and would be unduly burdened.

81.    Petition and USDA Proceedings.  On October 28, 2011, Resolute filed with USDA a petition in accordance with the CPRIA, the Softwood Lumber Order, and the Rules of Practice Governing Proceedings on Petitions to Modify or To Be Exempted

from Research, Promotion and Information Programs (7 C.F.R. §§ 900.52(c)-.71, 1200.50-.52). Resolute amended the petition on June 22, 2012.

82.     Resolute challenged the constitutionality of the CPRIA based on the unconstitutional delegation of authority to private parties to decide, through referenda, the status of the Softwood Lumber Checkoff program, and challenged the lawfulness of the Softwood Lumber Order under the CPRIA and APA.  AMS denied the allegations.

83.     Resolute submitted a certified application for subpoena duces tecum on July 27, 2012 seeking production of three kinds of documents: (1) documents showing the names of manufacturers and importers that AMS originally considered potentially eligible to vote in the referendum; (2) documents showing the names of companies that AMS deemed eligible to receive ballots in the referendum and the rationale for their eligibility; and (3) documents showing the names of voters who submitted ballots to AMS in the referendum.

84.     The application for the subpoena expressly stated that the actual votes of the referendum participants were not being sought.   There would be no breach of confidentiality.  The purpose was to examine possible biases in the application of exemptions.  AMS opposed the *subpoena duces tecum*.

85.     Resolute's application demonstrated the relevance, materiality, competency and necessity of the information sought in the subpoena in accordance with § 900.62(b) of the Rules of Practice governing the proceedings.

86.     Resolute explained that, despite FOIA requests, Resolute's letters to the Secretary and USDA counsel, and an application for *subpoena duces tecum*, USDA had never reconciled its Federal Register notice statements regarding the number of

eligible referendum voters with the number of voters to whom AMS actually sent ballots, nor the number of importers expected to pay with the number permitted to vote.

87.     USDA Administrative Law Judge Jill S. Clifton certified to the USDA Judicial Officer the question of whether to permit the *subpoena duces tecum* on January 14, 2013, and indicated a disposition favoring disclosure.

88.     The Judicial Officer, however, instructed Judge Clifton on January 22, 2013, to quash the *subpoena duces tecum*.  In the Ruling on the Certified Question, the Judicial Officer concluded summarily that "Resolute's application does not show how the documents sought are relevant to, material to, or necessary to prove the allegations in Resolute's First Amended Petition regarding the constitutionality of the Softwood Order, fraud, bias, or the Secretary of Agriculture's purported manipulation of the voter pool."

89.     Judge Clifton conducted a four-day hearing on Resolute's petition, from January 28 to 31, 2013, at USDA in Washington D.C.  AMS officials Sonia Jimenez (Director, Promotion and Economics Division, Fruit and Vegetable Program) and Maureen Pello (Marketing Specialist, Promotion and Economics Division, Fruit and Vegetable Program), Resolute CEO Richard Garneau, and expert witness Dr. Anna Greenberg, gave sworn testimony regarding the Softwood Lumber Order and Checkoff program.

90.     AMS officials testified repeatedly at the hearing that USDA was required to accept and act on a referendum vote for or against a checkoff program, without the exercise of any discretion regarding whether the program would be consistent with and

would effectuate the purpose of the Act. They testified that, consistent with this understanding, USDA did not exercise such discretion in this instance.

91.     AMS officials also testified that the industry was entitled by statute to decide on company exemptions; that AMS never knew the number of companies,  nor the quantity of lumber, excluded by the 15 million board foot exemption; never knew or could determine the total softwood lumber volume; and never knew the quantity of softwood lumber potentially subject to the checkoff order, all information required by the statute.

92.     AMS testified that the 15 million board foot exemption was wanted by the BRC because it would allow the Softwood Lumber Checkoff to raise the total sum of money that the BRC sought for the program.  AMS had encouraged the BRC to set a volume exemption because, otherwise, many small growers would have votes in the referendum and they might be expected to oppose it.

93.     USDA chose 2010 as the "representative period" for determining eligibility to vote in the referendum because USDA believed it to be the most recent period of data available prior to the conduct of the referendum, but USDA never published what the 2010 data showed for the number of domestic manufacturers and importers of softwood lumber who were eligible to vote in the referendum, and considered no other criteria for "representative."

94.     USDA did not know the total volume of the commodity or the total number of importers and domestic producers potentially subject to the checkoff based on 2010 data.

95.     Resolute's witness, Dr. Anna Greenberg (Senior Vice President, Greenberg, Quinlan, Rosner Research) was recognized by Judge Clifton as an expert witness regarding survey research methodology.  Dr. Greenberg gave her expert testimony that the referendum was inherently flawed with bias, and the referendum procedures did not meet Office of Management and Budget nor professional survey research methodology standards.

96.     Ballots sent by AMS to voters in the referendum asked voters to indicate whether they supported implementation of the Softwood Lumber Checkoff, as well as their annual volume of softwood lumber shipped or imported.  AMS used the volume data to determine whether voters shipped or imported more than 15 million board feet of softwood lumber, and if not, to exclude those voters' votes.

97.     Professionals in the field of survey research and voting methodology recognize that referenda need to be conducted in accordance with certain standards in order for their results to be a valid representation of the vote and the actual preferences of the voting population.

98.     One must begin with the most accurate list of voters possible and eliminate duplications.  Notification letters sent to the voting population in advance of the referendum should be succinct, clear, and convey an important urgency in order to boost the response rate.

99.     More than one pre-referendum notice may be required, depending on the size of the voting population, and the balloting should be given sufficient time for an ample number of responses to be completed.  The responses must be examined as

they come in to determine whether there is bias in the return rate, and whether some group systematically is not returning ballots.

100. The referendum needs to be conducted such that one could replicate the results, and one would need to be careful to avoid introducing an unintended bias that would favor one group within the population over another. Equal information about participation in the referendum must be provided to all of the voters.

101. AMS failed to observe these standards.

102. AMS also failed to observe OMB and USDA Quality of Information Guidelines for the referendum balloting.

103. AMS testified that it did not verify the accuracy of the list of importers subject to the referendum, and did not contact all importers of record to confirm contact information was accurate and up-to-date.

104. AMS testified that it made no language provision for a potentially large number of francophone voters, although later when the Board had difficulty collecting the tax from francophone importers it sent notices in French.

105. By contrast, AMS contacted all domestic manufacturers by phone to discuss the information according to a script. This disparity in voter contact introduced bias in the voter list such that the domestic producer voter list was more likely to be accurate than the importer voter list.

106. USDA's pre-referendum notification letter was too long and muddled the urgency of voter participation by describing the vote as an "opportunity" to participate, thus contributing further to misinformation provided by the BRC.

107.    USDA offered no evidence in the record that AMS met OMB standards requiring a plan for multiple contacts to survey participants in order to improve the response rate.  Nor did USDA make any efforts to track down non-responders when it realized it had received a modest number of ballots.

108.    These failures were compounded by the "very narrow" response window of three weeks, too narrow for mail surveys of this type, especially involving international delivery.  The failure to respect these minimal standards opened the data to non-response bias.

109.    USDA failed to observe OMB guidelines requiring the agency to disclose sufficient information about the data collection for the results to be replicated.  The Softwood Lumber Checkoff referendum could not be replicated absent information about recipients of ballots, as well as information about those who returned ballots.  USDA refused to provide that information as evidence of the validity of the referendum.

110.    The data required to address non-responses are missing, denied by the USDA Judicial Hearing Officer's decision to overrule Judge Clifton's recommendation to approve Petitioner's application for a *subpoena duces tecum*.

111.    USDA's application of the *de minimis* exemption and administration of the referendum created multiple layers of bias that favored domestic manufacturers.  USDA began with a population of 1,478, split between 883 importers and 595 domestic producers, reduced the set of eligible voters to 103 importers and 363 domestic producers, then reduced it again to 311 voters, of which it appears only 68 were importers.

112.    This systematic bias amounted to a 92% reduction of importers, but only a 59% reduction in domestic manufacturers.  The application of the exemption thus biased the referendum results in favor of domestic manufacturers.

113.    Bias was created by the difference in the messages USDA conveyed to importers and domestic manufacturers.  Domestic manufacturers were contacted by phone according to a script, but only select importers were contacted by phone, and even there, no script was used.  AMS testified that importers were not questioned about the items reviewed on the domestic calls, including whether the manufacturer was over or under the 15 million board foot exemption.

114.    These and other failures by USDA to adhere to professionally-accepted survey standards, as well as OMB and USDA regulations, demonstrate the arbitrary and capricious nature of the conduct of the referendum and implementation of the marketing order.

115.    The parties submitted post-hearing briefs from April through July 2013.

116.    In addition to challenging the constitutionality of the CPRIA on its face and as applied, Resolute argued that USDA violated the APA when it:

a.  failed to consider whether the 15 million board foot exemption was a "*de minimis* quantity of an agricultural commodity otherwise covered by the order" per 7 U.S.C. § 7415(a)(1);

b.  failed to determine whether the majority of persons voting for approval also represented "a majority of the volume of the agricultural commodity" per 7 U.S.C. § 7417(e)(3);

   c.   selected 2010 as the "representative period" under 7 U.S.C. § 7417(a)(1) for

persons producing and importing softwood lumber without determining

whether 2010 was in fact a period representative of normal production and

shipments for the industry;

   d.   failed to explain how it determined to send referendum ballots to 311

producers and importers when its estimates in the Proposed Rule and Final

Rule published before and after the referendum announced 466 eligible

producers and importers;

   e.   failed to determine whether the 15 million board foot "*de minimis*" exemption

in fact identified small producers;

   f.   delegated to the BRC authority to determine exemptions and, hence, eligibility

to vote;

   g.   improperly decided to conduct the referendum based on a "majority" of

comments submitted prior to the Proposed Rule;

   h.   failed to follow reasonable, minimal survey methodology standards to ensure

a valid, representative, unbiased referendum;

   i.   improperly denied disclosure of the list of companies to whom referendum

ballots were sent.

   117.   Judge Clifton issued a decision and order on April 30, 2014, denying

Resolute's petition, finding that the Softwood Lumber Order and its authorizing statute,

the CPRIA, were written and applied in accordance with law.

   118.   Resolute submitted a timely appeal to the USDA Judicial Officer on June

12, 2014.

119.   <u>Decision of the Secretary/USDA Judicial Officer</u>.  The Judicial Officer denied Resolute's appeal in a decision dated November 26, 2014, a copy of which is attached as Exhibit A.

120.   The Judicial Officer declined to rule on Resolute's claim that the CPRIA is facially unconstitutional.

121.   The Judicial Officer acknowledged USDA officials' statements that the Secretary lacked discretion to act contrary to the results of the checkoff referendum, but insisted that the Secretary nevertheless did have and exercised discretion whether to follow the referendum results.

122.   The Judicial Officer denied Resolute's claims that USDA had failed to comply with the APA in its application of the CPRIA to the Softwood Lumber Order.

**FIRST CAUSE OF ACTION:**

**The Statute Unconstitutionally Delegates
Executive Authority To Referendum Participants**

123.   Paragraphs 1 through 122 of this Complaint are incorporated herein by reference.

124.   Congress cannot delegate authority forbidden by the Constitution, regardless of how practical or laudable the policy goals might be in doing so.  *See, e.g.*, *INS v. Chadha*, 462 U.S. 919 (1983).

125.   The Vesting Clause and the Appointments Clause of Article II of the U.S. Constitution prohibit Congress from delegating Executive Branch powers to individuals who have not been appointed as officers of the United States: "[A]ny appointee exercising significant authority pursuant to the laws of the United States is an 'Officer of

the United States,' and must, therefore, be appointed in the manner prescribed."

*Buckley v. Valeo*, 424 U.S. 1 (1976), 125-26.

126.   The CPRIA requires that the Secretary abide by the results of a referendum of non-government officials disapproving a marketing program.  When a marketing program "is not favored by persons voting in a referendum," the Secretary "shall suspend or terminate" it.  7 U.S.C. § 7421(a).

127.   Thus, the CPRIA vests power to continue or terminate a checkoff entirely in those covered by the program, rather than any Executive Branch official, which is an improper delegation of governmental power to individuals subject to none of the Constitution's checks and balances.

128.    The binding effect given to referendum results is integral to the statutory scheme and, therefore, not severable from the statute. Thus, a decision properly recognizing the referendum procedure as *ultra vires* would necessarily undermine constitutionality of the entire statutory scheme.

129.   The Court should declare and hold that the CPRIA is unconstitutional because it unlawfully delegates Executive Branch power to private parties.

### SECOND CAUSE OF ACTION:

### USDA's Application Of The Statute Unconstitutionally Delegated Executive Authority To Referendum Participants

130.   Paragraphs 1 through 129 of this Complaint are incorporated herein by reference.

131.    The Vesting Clause and the Appointments Clause of Article II of the U.S. Constitution prohibit Congress from delegating Executive Branch powers to individuals who have not been appointed as officers of the United States.

132.    USDA conducted an initial referendum for the Softwood Lumber Checkoff in May and June of 2011.

133.     USDA has acknowledged that in this referendum, as in all other referenda under the CPRIA, USDA committed to "go with the vote" of persons who are not officers of the United States, believing the statute required it.  The Secretary exercised no discretion and USDA considered itself bound by the results of the vote.

134.    The Judicial Officer, in *post hoc* rationalization, contradicted the sworn testimony of USDA's representatives during the hearing and USDA proceedings.  The Judicial Officer's arguments, however, were not evidence and properly could not have been admitted as evidence in the USDA proceedings.

135.    AMS delegated other responsibilities unlawfully to the BRC, the proponent group of private parties.  The agency exempted companies from the program (and thereby denied voting rights) according to the wishes of the proponent group. The agency granted authority to respondents of a Notice and Comment rule-making to determine whether to proceed to a referendum.   The Court should declare and hold that USDA violated the Vesting Clause and Appointments Clause of the U.S. Constitution by removing discretionary decision-making authority from the Secretary and placing it in the hands of private individuals who are not officers of the United States.

### THIRD CAUSE OF ACTION:

### The Statute Unconstitutionally Delegates
### Legislative Authority To Referendum Participants

136.    Paragraphs 1 through 135 of this Complaint are incorporated herein by reference.

137.    To the extent that the authority delegated to the private persons voting in the referendum under the CPRIA is deemed legislative authority, rather than executive authority, the delegation remains unconstitutional.

138.    Congress is required to provide an "intelligible principle" to guide execution of the laws that it passes, lest Congress cede its core legislative power.  The CPRIA fails to pass constitutional muster because it places discretion to terminate marketing programs in the hands of private parties with no intelligible principle to guide the exercise of that discretion.

139.    Absent an "intelligible principle" to cabin the exercise of discretion, a delegation is one not of executive power, but of legislative power, which is forbidden.

140.    In this instance, the CPRIA provides no standard to guide the referendum participants in their decision of whether a program may be created or allowed to continue in operation.

141.    Delegations of governmental authority to private citizens are presumptively unlawful.  As the D.C. Circuit has recognized, such an assignment is "'legislative delegation in its most obnoxious form; for it is not even delegation to an official or an official body, presumptively disinterested, but to private persons whose interests may be and often are adverse to the interests of others in the same business.'"

*National Ass'n of Regulatory Utility Com'rs v. F.C.C.*, 737 F.2d 1095, 1143-44 (D.C. Cir. 1984) (quoting *Carter v. Carter Coal*, 298 U.S. 238, 311 (1936)).

142.    Therefore, the referendum procedure is an unlawful delegation of powers exclusively reserved to Congress.

143.    The Court should declare and hold that the CPRIA, and any actions taken pursuant to it, are unconstitutional as unlawful delegations of legislative power to private parties.

### FOURTH CAUSE OF ACTION

### The CPRIA Violates The Due Process Rights
### Of Producers And Importers

144.    Paragraphs 1 through 143 of this Complaint are incorporated herein by reference.

145.    When the discretionary exercise of government authority over the rights and liberties of others is placed in private hands, those persons "are not bound by any official duty, but are free to withhold consent for selfish reasons or arbitrarily and may subject [the others] to their will or caprice," in violation of the others' due process rights. *State of Washington ex rel. Seattle Title Trust Co. v. Roberge*, 278 U.S. 116, 122 (1928). *See also Eubank v. Richmond*, 226 U.S. 137 (1912). Such delegations are among the "situations [that] have been identified in which experience teaches that the probability of actual bias on the part of the judge or decisionmaker is too high to be constitutionally tolerable." *Withrow v. Larkin*, 421 U.S. 35, 47 (1975).

146.    The CPRIA places the authority to approve or terminate industry-wide checkoff programs in the hands of industry participants, authorizing them to wield the government's taxing and regulatory power against their competitors. This arrangement

is functionally indistinguishable from cases "in which the adjudicator has a pecuniary

interest in the outcome" and is, therefore, barred from presiding by basic due-process

principles. *Withrow v. Larkin*, 421 U.S. 35, 47 (1975).

147.   The CPRIA's referendum procedure thus violates the Due Process Clause

of the Fifth Amendment to the United States Constitution.

148.   The Court should declare and hold that the CPRIA violates the Fifth

Amendment's Due Process Clause and that the orders establishing the Softwood

Lumber Checkoff therefore are void.


### FIFTH CAUSE OF ACTION:

### USDA Violated The APA When Its Implementation Of
### The Softwood Lumber Checkoff Did Not Comply With The CPRIA


149.   Paragraphs 1 through 148 of this Complaint are incorporated herein by

reference.

150.   USDA's implementation of the Softwood Lumber Checkoff failed to comply

with several important statutory terms in the CPRIA:

151.   *De minimis* exemption.  The CPRIA confers upon the Secretary "authority

. . . to exempt from the order any *de minimis* quantity of an agricultural commodity

otherwise covered by the order."  7 U.S.C. § 7415(a)(1).

152.   Citing this *de minimis* exemption provision in the CPRIA, USDA exempted

15 million board feet of softwood lumber annually from assessment under the checkoff

order for every producer and importer.

153.   USDA made no effort to determine the quantity of softwood lumber

covered by the exemption, nor did USDA determine the total quantity of softwood

lumber produced and shipped.  USDA could not know, therefore, whether the 15 million board foot exemption would exempt a *de minimis* quantity, or a large quantity, of the commodity.

154.   This decision affected the number of companies who were permitted to vote in the Softwood Lumber Checkoff referendum.  Producers and importers whom USDA believed to ship less than 15 million board feet annually were not permitted to vote in the referendum, ostensibly because they would not be subject to checkoff order assessments.

155.   USDA failed to comply with the CPRIA when it failed to determine what quantity of domestically shipped or imported softwood lumber would be exempted by the 15 million board foot exemption, and whether that quantity was *de minimis*.

156.   "Majority of the volume of the agricultural commodity."  The CPRIA provides at 7 U.S.C. § 7417(e) three ways in which a checkoff referendum may be considered to have passed:

> (e) Approval of order
> An order may provide for its approval in a referendum—
>> (1) by a majority of those persons voting;
>> (2) by persons voting for approval who represent a majority of the volume of the agricultural commodity; or
>> (3) by a majority of those persons voting for approval who also represent a majority of the volume of the agricultural commodity.

157.   For the Softwood Lumber checkoff, the proponent group chose the third option and USDA concurred with the choice of the proponent group:  "a majority of those persons voting for approval who also represent a majority of the volume of the agricultural commodity."

158.   AMS has admitted that it never determined the total volume of the softwood lumber produced or imported into the United States as required by the plain language of the statute.

159.   Instead, AMS determined that the volume as represented by those who voted in favor of the checkoff was more than the volume represented by those who voted against.

160.   The statute specifies that the "majority of those persons voting for approval" must "represent a majority of the volume of the agricultural commodity."  The statute does not provide for the "majority of those persons voting for approval" to "represent a majority of the volume of the agricultural commodity of those voting for approval."

161.   USDA's determination is not consistent with any of the three statutory methods for determining approval.  Acceptance of the referendum results and implementation of the checkoff under these circumstances violated the CPRIA and the APA.

162.   "Representative period."  The CPRIA states at 7 U.S.C. § 7417(a)(1):

(a) Initial referendum
(1) Optional referendum
>   For the purpose of ascertaining whether the persons to be covered by an order favor the order going into effect, the order may provide for the Secretary to conduct an initial referendum among persons to be subject to an assessment under section 7416 of this title who, during a ***representative period*** determined by the Secretary, engaged in—
>   **(A)** the production or handling of the agricultural commodity covered by the order; or
>   **(B)** the importation of the agricultural commodity.

[emphasis added]

163. The plain language meaning of "representative period" is that the period selected must be representative of something—in this case, representative of the "production" or "importation of the agricultural commodity."

164. The Secretary selected 2010 as the "representative period" based exclusively on 2010 data being the most recent data available prior to conducting the referendum, and not because they were representative of normal production or imports in the softwood lumber industry.

165. Testimony at the hearing established that 2010 was the worst year of softwood lumber production and importation in, perhaps, 30 years, and therefore was not a "representative period" as required by the statute.

166. Webster's defines the adjective "representative" to mean, "representing or serving to represent," but more specifically, "being an example or type of a certain class or kind of thing." AMS never provided, anywhere, any explanation for what made "recent" available data "representative."

167. USDA failed to explain a reasonable basis for the Secretary's choice of a representative period. The selection of an especially volatile period, as USDA itself recognized the most recent period of available data to be, is arbitrary, capricious and an abuse of discretion contrary to the purpose of the referendum and of the statute.

### SIXTH CAUSE OF ACTION:

### USDA Violated The APA When It Failed To Provide A Consistent Explanation For The Number Of Eligible Referendum Voters

168. Paragraphs 1 through 167 of this Complaint are incorporated herein by reference.

169.    USDA has failed to provide a consistent explanation for how it determined the number of softwood lumber companies that would pay assessments under the Order, and therefore would be eligible to vote in the Softwood Lumber Checkoff referendum.

170.    Before and after the referendum, AMS reported 466 eligible voters. Contrary to the statements it made in the two published Federal Register notices, AMS mailed ballots to only 311 voters.

171.    AMS never published, and never disclosed or explained during the hearing, the data that it used to calculate the number of eligible voters.  The failures to explain the selection of voters to whom it decided to give ballots, and to reconcile those numbers with the only data AMS provided to the public on voter eligibility, constitute violations of the APA.

172.    USDA has failed to "examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made," because it has failed to reconcile its published and unpublished pronouncements on the number of voters who were eligible to vote in the referendum.  *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). USDA's conduct of the referendum is arbitrary and capricious and should not be sustained.

## SEVENTH CAUSE OF ACTION:

### USDA Violated The APA By Failing To Employ Minimal Reasonable Standards For Conducting The Referendum

173.    Paragraphs 1 through 172 of this Complaint are incorporated herein by reference.

174.    AMS conducted the referendum and implemented the marketing order in an arbitrary and capricious manner by failing to adopt essential minimum standards to ensure a responsive vote free from bias.

175.    Judge Clifton qualified Resolute's witness, Dr. Anna Greenberg, as an expert witness in survey and census research methodology, but then disagreed with her that the nature of the referendum required essential minimum standards to be followed as Dr. Greenberg had opined.

176.    Judge Clifton concluded that referendum techniques that would have ensured "a more complete overall response" did not need to be followed because they "would have required departure from the announcement of the referendum (published in the Federal Register)…."

177.    Judge Clifton's conclusion placed greater importance on the publication of procedures than the adoption of procedures that would comply with Office of Management and Budget regulations, referendum techniques that would avoid a biased decision, and fairness in the conduct of the referendum.  Judge Clifton's conclusion promoted the view that any referendum procedures, no matter how arbitrary or biased, would be immune from judicial review so long as they had been published in the Federal Register.

178.    The Softwood Lumber Order referendum had a material impact on the decision to implement the order, and the failure to follow minimum procedures to ensure a fair referendum was a violation of the APA.

179.    The Judicial Officer reviewing Judge Clifton's decision similarly disregarded the unrebutted expert opinion of Dr. Greenberg.

180.    The Judicial Officer agreed that the Administrative Law Judge neglected to address Resolute's contention that the Softwood Lumber Checkoff referendum failed to comply with procedures established by OMB, but declined to remand by denying that the referendum collected data from voters.

181.    The Judicial Officer failed to appreciate that each referendum ballot required the voter to state its softwood lumber production or shipments in order to assure that only the votes of non-exempt companies would be included in the referendum, thus necessarily including data collection.

182.    USDA's failure to administer the referendum in accordance with professionally recognized standards, including the OMB guidelines, evidences arbitrary and capricious conduct of the referendum in violation of the APA.


### EIGHTH CAUSE OF ACTION:

### USDA Violated The CPRIA And APA By Failing To Exercise Its Discretion In Issuing The Order


183.    Paragraphs 1 through 182 of this Complaint are incorporated herein by reference.

184.    USDA's abdication of authority to private parties—the private voters in the referendum decision, and the BRC with respect to the decision for a *de minimis* exemption—violates the CPRIA and APA.

185.    The CPRIA requires the Secretary to determine, before issuing a final order and irrespective of any referendum result, "that the final order developed with respect to an agricultural commodity is consistent with and will effectuate the purpose of this subchapter." 7 U.S.C. § 7413(c).

186.    AMS's testimony that the Secretary is bound and must "go with the vote" of the referendum demonstrates that USDA violated the statutory requirement under the CPRIA that the Secretary must exercise independent judgment with respect to the proposed order.

187.    Similarly, AMS's testimony that the 15 million board foot "*de minimis*" exemption was a decision made by the BRC violated the statutory requirement regarding the Secretary's exercise of independent judgment.  Approving the BRC exemption of 15 million board feet was arbitrary and capricious, irrational, and a violation of the APA.

188.    USDA's deferral to the private parties was not in accordance with the CPRIA and therefore violated the APA.


**NINTH CAUSE OF ACTION:**

**USDA Violated The APA By Refusing To Disclose The Referendum Voter List**

189.    Paragraphs 1 through 188 of this Complaint are incorporated herein by reference.

190.    USDA improperly denied Resolute the right to issue a *subpoena duces tecum* for documents material to Resolute's claims; namely, the list of voters eligible for the referendum.

191.    USDA should have produced the documents of necessity because it failed to document and show how it determined the pool of eligible voters for the checkoff referendum, and because OMB Guidelines require that the data collection be replicable, which was not possible without this information.

192.    The Judicial Officer's rulings do not explain why documents showing the potentially eligible, eligible, and actual voters in the referendum would not be relevant, material, competent and necessarily disclosed in relation to Petitioner's claim that USDA had failed to explain and reconcile the conflicting numbers regarding the voters' eligibility to participate in the referendum.  USDA cannot meet its APA and OMB obligations without releasing them.

193.    USDA's failure to disclose this information is arbitrary and capricious and violates the APA.

### TENTH CAUSE OF ACTION:

**USDA Violated The APA By Promulgating the Order Based On A "Majority" Of Comments, Rather Than A Finding That The Order Furthers The Act's Purpose**

194.    Paragraphs 1 through 193 of this Complaint are incorporated herein by reference.

195.    The Secretary may only promulgate a checkoff order that he "determines…is consistent with and will effectuate the purpose of [the Act]." § 7413(c).

196.   AMS testified, however, that it was required to promulgate an order and conduct a referendum based on industry support as revealed through a tallying of submitted comments on the proposed order.

197.   Consistent with that view, USDA relied entirely and exclusively on the number of comments submitted during the Notice and Comment period to determine whether there was industry support, placing the decision of whether to promulgate a final rule in the hands of the "majority" of commenters.  This action was contrary to the requirements of the CPRIA and therefore violates the APA.

198.   USDA's method of ascertaining industry support from filed comments was unreliable and incapable of demonstrating actual industry sentiment. USDA improperly relied on the number of favorable versus unfavorable comments, as it peculiarly construed them, to find a majority supporting the proposed program.  In so doing, USDA counted multiple comments submitted by the same individuals, counted comments tainted by the fundamental misunderstanding that the program could and would be controlled by industry, and counted comments conditioning support for the program on changes to the proposal as "neutral" rather than opposed. USDA's determination, based on this flawed methodology, that the proposed order was supported by industry – with a total of only 55 comments—was therefore arbitrary and capricious.

199.   It is arbitrary and capricious to conclude there is support for a program when it is known, as well, that the perceived support is based on misleading and incorrect information.  USDA had to be confident that the industry knew what the program would be before USDA could conclude the industry supported it, yet USDA did

not assure that the industry understood what it would be getting in the checkoff program.

200.    AMS's treatment of the Notice and Comment on the referendum as a vote was arbitrary and capricious and contrary to law.

## PRAYER FOR RELIEF

WHEREFORE,  Plaintiff respectfully requests that the Court grant the following relief:

1.  a declaratory judgment that the CPRIA is facially unconstitutional, and that the orders establishing the Softwood Lumber Checkoff  therefore are void;

2.  a declaratory judgment that USDA's application of the CPRIA to implement the Softwood Lumber Checkoff is unconstitutional, and that the Softwood Lumber Order is void;

3.  an order voiding the Softwood Lumber Order and its implementing regulations at 7 C.F.R. §§ 1217.1 through 1217.108 as arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law under the APA;

4.  an order instructing USDA to cease the collection of Softwood Lumber Order assessments and refund all unspent funds collected from Plaintiff through assessments made pursuant to the Softwood Lumber Order;

5.  an order requiring USDA to make restitution for all spent funds collected from Plaintiff through assessments made pursuant to the Softwood Lumber Order; and

6.  such other legal and equitable relief the Court may deem just and proper.

Respectfully submitted by:


/s/ Elliot J. Feldman_____
Elliot J. Feldman (DC Bar No. 418501)
David B. Rivkin (DC Bar No. 394446)
Michael S. Snarr (DC Bar No. 474719)
Andrew M. Grossman (DC Bar No. 985166)
Baker & Hostetler LLP
Washington Square, Suite 1100
1050 Connecticut Avenue, N.W.
Washington, D.C. 20036-5304
Phone: 202.861.1679
Facsimile: 202.861.1783
Email: efeldman@bakerlaw.com