**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **RESOLUTE FOREST PRODUCTS, INC.,** | |
| **Plaintiff,** | |
| **v.** | **Civil Action No. 14-2103 (JEB)** |
| **U.S. DEPARTMENT OF AGRICULTURE,** *et al.*, | |
| **Defendants.** | |

**MEMORANDUM OPINION**

"Out of timber so crooked as that from which man is made, nothing entirely straight can be carved." So said Immanuel Kant about humanity; so claims Plaintiff Resolute Forest Products about the lawfulness of compulsory marketing programs developed by private parties and overseen by the U.S. Department of Agriculture.

In 2010 and 2011, Agricultural Marketing Service (AMS), housed within the USDA, assisted members of the softwood-lumber industry in establishing a budding Softwood Lumber Checkoff Order. Checkoff orders are rooted in our nation's history of government support for commodity producers who seek the benefits of collective marketing and promotion. These orders rake in mandatory assessments from all manufacturers and importers of a given commodity. The Commodity Promotion, Research and Information Act (the CPRIA), 7 U.S.C. §§ 7411-7425, empowers many industries — including the softwood-lumber industry — to work with the USDA to plant the seeds for the cultivation of such collective-marketing programs through the development and issuance of these orders.

In the case of the Softwood Lumber Checkoff Order, however, Resolute believes the rulemaking process was rotten to the core.  In a nutshell, it is unhappy with the manner in which assessments have been determined.  After protesting the Order before an administrative law judge and appealing that judge's denial, it brought suit before this tribunal.  Resolute's Complaint lumbers on at length about problems with the agency's procedures, seemingly having an ax to grind with every step in the promulgation of the Checkoff Order.  It raises numerous objections to the notice-and-comment rulemaking process, the agency's deference to the industry's Blue Ribbon Commission that put forward the Order, and the referendum AMS held to obtain industry approval.  Plaintiff's claims ultimately branch out into four constitutional challenges to the CPRIA and six allegations of violations of the Administrative Procedure Act.  As to the latter category, Plaintiff assails the AMS for mistakes made during the rulemaking process, some of which stem from misstatements in the Federal Register and opaque explanations for its seemingly questionable actions.  Both sides have now moved for summary judgment.

Much timber has been felled to produce the administrative record that grew out of the ALJ's adjudication, including hearing logs, Resolute's administrative appeal, and the parties' briefs before this Court.  Given that the parties at times camouflage the issues with unclear briefing, the Court was repeatedly forced to leaf through the administrative record itself to find answers.  Having now done so, the Court concludes that Plaintiff has generally barked up the wrong tree.  Resolute's wooden understanding of the agency's obligations largely does not mesh with the broad discretion the USDA is granted to construct a permissible checkoff order.

Defendants — and not Plaintiff — are therefore entitled to summary judgment on nearly every APA count.  Yet on one issue Resolute hits the nail on the head.  Defendants fall short of

providing an adequate explanation for the threshold chosen to exempt certain smaller industry players from the Order.  While it often goes against the grain to remand without vacatur, in this instance that remedy is appropriate, so as not to prematurely uproot an ongoing checkoff order.  On one APA count alone, then, the Court will deny Defendants' Motion for Summary Judgment and remand to the USDA.  Such an outcome also obviates the need to rule on the constitutional questions, which must lie dormant for another season.

## I.  Background

Puns aside, given the complexities of the administrative process — and the often picayune nature of Plaintiff's grievances — a contextual overview is necessary first.  The Court thus begins by briefly introducing the parties to this lawsuit and then moves on to a longer explanation of the CPRIA and the process through which the Softwood Lumber Checkoff Order was developed and implemented.  Caution, fair reader, for into the administrative-lawmaking thicket we go.

### A.  Parties

Plaintiff Resolute Forest Products, Inc., is an American company incorporated under the laws of Delaware, with significant investments in the production of Canadian softwood lumber, paper, and other forest products.  See Compl., ¶ 18.  Its principal place of business is in Canada, where the majority of its sawmills are located.  See id.  Plaintiff imports softwood lumber into the United States and is thus subject to assessment under the Softwood Lumber Checkoff Order.  See Def. MTD/MSJ at 2.

Defendants include the United States Department of Agriculture and its Secretary, Tom Vilsack, who is sued in his official capacity.  See Compl., ¶ 20.  The Secretary is charged with administering checkoff orders under the CPRIA.  See 7 U.S.C. §§ 7411-25.  Most of the

Secretary's functions under the CPRIA have been delegated to the Under Secretary of

Agriculture for Marketing and Regulatory Programs and then further "sub-delegated" to the

Administrator of the Agricultural Marketing Service, which administers, among other things,

marketing orders.  See Def. MTD/MSJ at 5.  For readability, the Court will here reference the

Secretary, the USDA, and AMS interchangeably.

      B.   The CPRIA and the Softwood Lumber Checkoff Program

      Congress has long regulated the promotion and sale of agricultural commodities by

enabling the federal government to coordinate with industries to advance such promotional

efforts.  See Avocadoes Plus, Inc., v. Veneman, 370 F.3d 1243, 1245 (D.C. Cir. 2004).  For most

agricultural commodities, limited product differentiation means that if one producer promotes its

commodity product, all producers are likely to benefit, creating free-rider problems.  See

William Connor Eldridge, United States v. United Foods: United We Stand, Divided We Fall —

Arguing the Constitutionality of Commodity Checkoff Programs, 56 Ark. L. Rev. 147, 159

(2003).  The CPRIA thus authorizes the Secretary of Agriculture to establish "checkoff"

programs, which impose on domestic manufacturers and foreign importers of an agricultural

commodity a mandatory assessment on the sale of that commodity.

      Marketing programs funded by these checkoff orders can be famously effective,

producing well-known classics of American advertising such as "Beef, it's what's for dinner"

and "Milk, it does a body good."  See Compl., ¶ 2.  Among the agricultural commodities covered

under the CPRIA are "products of forestry," see 7 U.S.C. § 7412(1)(D), including softwood

lumber, a term the USDA uses to refer to certain "'lumber and products' manufactured from 'one

of the botanical groups of trees that have needle-like or scale-like leaves, or conifers.'"  Def.

MTD/MSJ at 1.  Softwood lumber is used in the United States primarily in residential home

construction.  See Softwood Lumber Research, Promotion, Consumer Education and Industry

Information Order, 76 Fed. Reg. 46,185, 46,186 (Aug. 2, 2011).

 After facing one of the "worst markets in history" in the late aughts, in 2010 members of

the softwood-lumber industry sought to benefit from such a campaign.  See Softwood Lumber

Research, Promotion, Consumer Education and Industry Information Order, 75 Fed. Reg.

61,002, 61,005 (Oct. 1, 2010).  The CPRIA authorizes the Secretary to issue an order in response

to requests by associations representing producers of a particular commodity.  See 7 U.S.C.

§ 7413(a)(1)(C).  Industry participation is critical: each checkoff order must also establish an

industry group that will carry out the program.  See id. § 7414(b)(1).  In this case, it was the Blue

Ribbon Commission (BRC), composed of 21 softwood-lumber chief-executive officers and

business leaders, which submitted the proposed Softwood Lumber Checkoff Order to AMS.  See

Pl. Opp./MSJ at 6; 75 Fed. Reg. at 61,005.  AMS modified this proposed Order, then determined

it was "consistent with and would effectuate the purposes" of the CPRIA.  See id. at 61,016.

Announcing its intention to implement the Checkoff Order, AMS published a notice of proposed

rulemaking in the Federal Register.  See id. at 61,002.  The proposed Order announced an initial

assessment rate of $0.35 per thousand board feet of softwood lumber shipped within or imported

into the United States.  See id.

 At the core of the dispute between the parties is the fact that the Order does not apply to

all softwood-lumber manufacturers and importers.  Under the CPRIA, the Secretary is authorized

"to exempt from the order any de minimis quantity of an agricultural commodity otherwise

covered by the order."  7 U.S.C. § 7415(a)(1).  To this end, AMS stated that the proposed Order

would exempt from assessment all entities that domestically ship or import less than 15 million

board feet per fiscal year.  See 75 Fed. Reg. at 61,002.  As we will see, whether the 15 million-

board-feet exemption was a "de minimis quantity" under the CPRIA is central to the resolution of the dispute.

Following the well-worn notice-and-comment-rulemaking playbook, AMS invited interested parties to submit comments on the proposed Order. See id. at 61,016. In a contemporaneous press release, AMS stated that "[i]f a majority of those commenting favored USDA moving forward" with the proposed Order, "a referendum would need to be held," and a majority of the voters by both number and volume would need to support the program in order for AMS to implement it. See USDA Seeks Comments on Establishing New Softwood Lumber Research, Promotion, Consumer Education and Industry Information Order, AMS 189-10 (Oct. 1, 2010) (Administrative Record, AR2105). In response, AMS received 55 comments in total, the majority of which it deemed supportive of the proposed Order. See Softwood Lumber Research, Promotion, Consumer Education and Industry Information Order, 76 Fed. Reg. 22,757, 22,770 (Apr. 22, 2011). Trees were not spared during this process, as AMS responded in great detail to these various comments. See id. at 22,770-75. Resolute, nevertheless, argues that AMS's actions related to the notice-and-comment process were in violation of the APA, see Compl., ¶¶ 41-53, as discussed in more detail below.

Finding the industry largely in favor of the proposed Order, AMS then announced a referendum among all producers who would be assessed under it. See 7 U.S.C. § 7417(a)(1) ("For the purpose of ascertaining whether the persons to be covered by an order favor the order going into effect, the order may provide for the Secretary to conduct an initial referendum among persons to be subject to an assessment . . . ."). AMS announced the procedures and timing of the referendum in the Federal Register, and it noted that every non-exempt softwood-lumber domestic manufacturer or importer was eligible to vote. See 76 Fed. Reg. at 22,775. Resolute

contests the manner in which AMS conducted the referendum, including its determination of which producers and importers were eligible. See Compl., ¶¶ 69-74.

AMS received a total of 173 completed ballots from the referendum, 159 of which it deemed valid. See Administrative Law Hearing, Witness Testimony of Sonia Jimenez, Director of the Promotion and Economics Division of the Fruit and Vegetable Program of the AMS at 319 (Jan. 28, 2013) (AR3316) [hereinafter "Testimony of Sonia Jimenez"]. Of those 159 ballots returned, 107 favored the Order, see id., constituting 67 percent of those voting in the referendum and "80 percent of the volume represented in the referendum." 76 Fed. Reg. at 46,185. The results of the referendum encouraged AMS to move forward with the Order, although not without protest from Resolute. AMS published the final Order in the Federal Register in August of 2011. See id. at 46,185-46,202.

In response to AMS's implementation of the Order, Resolute filed a petition with the USDA in accordance with the CPRIA on October 28, 2011. See Compl., ¶ 81; 7 U.S.C. § 7418(a)(1)(A) ("A person subject to an order . . . may file with the Secretary a petition . . . stating that the order . . . is not established in accordance with law; . . ."). Based on its 2010-calendar-year sales, Plaintiff imported less than 15 million board feet during 2010 and was thus ineligible to vote in the referendum. See In Re: Resolute Forest Products Petitioner, No. 12-0040, 2014 WL 1993757, at *5-6 (U.S.D.A. Apr. 30, 2014). Resolute later began to import more than 15 million board feet per year, however, and has been paying assessments on imports above that threshold since January 2012. See Pl. Rep. at 7. Resolute ultimately amended its protest, including a litany of constitutional challenges to the CPRIA, and these claims are mirrored in the counts it brings before this Court. See First Amended Petition to Terminate or Amend USDA's Softwood Marketing Order (June 22, 2012) (AR0236).

Plaintiff's first two adjudicative bites at the apple met with little success.  Administrative Law Judge Jill S. Clifton conducted a four-day hearing on Resolute's petition from January 28-31, 2013, at the USDA in Washington, D.C.  See Compl., ¶ 89.  Judge Clifton denied Resolute's petition, affirming both the Softwood Lumber Checkoff Order and the CPRIA.  See In re: Resolute, 2014 WL 1993757, at *12.  Undeterred, Plaintiff then filed a timely appeal to the USDA Judicial Officer on June 12, 2014.  See Compl., ¶ 118.  Judicial Officer William G. Jenson denied Resolute's appeal in a decision dated November 26, 2014.  See In re: Resolute Forest Products, Petitioner, No. 12-0040, 2014 WL 7534275 (U.S.D.A. Nov. 26, 2014).

Plaintiff now brings its case before this Court, seeking review of the denial of its petition, as the CPRIA allows.  See 7 U.S.C. § 7418(b)(1) ("The district court of the United States . . . shall have jurisdiction to review the final ruling on the petition . . . .").  Among its constitutional claims are that the CPRIA unconstitutionally delegates executive and legislative authority to private parties and violates the due-process rights of producers and importers. As touched on above, Plaintiff also alleges APA violations in nearly every action taken by AMS in the development and application of the Checkoff Order.  In response, Defendants have now filed a Motion to Dismiss or, in the Alternative, for Summary Judgment.  Plaintiff responded by filing a Cross-Motion for Summary Judgment.

## II.    Legal Standard

In the typical case, summary judgment may be granted if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986); Holcomb v. Powell, 433 F.3d 889, 895 (D.C. Cir. 2006).  A fact is "material" if it is capable of affecting the substantive outcome of the litigation.  See Liberty Lobby, 477 U.S. at

248; Holcomb, 433 F.3d at 895.  A dispute is "genuine" if the evidence is such that a reasonable

jury could return a verdict for the nonmoving party.  See Scott v. Harris, 550 U.S. 372, 380

(2007); Liberty Lobby, 477 U.S. at 248; Holcomb, 433 F.3d at 895.

Although styled Motions for Summary Judgment, the pleadings in this case more

accurately seek the Court's review of an administrative decision.  Challenges under the CPRIA

proceed under the Administrative Procedure Act's familiar "arbitrary and capricious" standard of

review.  See 7 U.S.C. § 7418(b)(1); 5 U.S.C. § 706(2)(A).  Because of the limited role federal

courts play in reviewing such administrative decisions, the typical Rule 56 summary-judgment

standard does not apply to the parties' dueling motions on Resolute's APA claims.  See Sierra

Club v. Mainella, 459 F. Supp. 2d 76, 89-90 (D.D.C. 2006).  Instead, in APA cases, "the function

of the district court is to determine whether or not . . . the evidence in the administrative record

permitted the agency to make the decision it did."  Id. (internal citations omitted).  Summary

judgment thus serves as the mechanism for deciding, as a matter of law, whether an agency

action is supported by the administrative record and is otherwise consistent with the APA

standard of review.  See Bloch v. Powell, 227 F. Supp. 2d 25, 31 (D.D.C. 2002) (citing Richards

v. INS, 554 F.2d 1173, 1177 (D.C. Cir. 1977)).

The APA requires courts to "hold unlawful and set aside agency action, findings, and

conclusions" that are "arbitrary, capricious, an abuse of discretion, or otherwise not in

accordance with law."  5 U.S.C. § 706(2)(A).  Under this "narrow" standard of review — which

appropriately encourages courts to defer to the agency's expertise, see Motor Vehicle Mfrs.

Ass'n of United States, Inc. v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983) — an

agency is required to "examine the relevant data and articulate a satisfactory explanation for its

action including a rational connection between the facts found and the choice made."  Id.

(internal quotation marks omitted).  "In reviewing agency action under that standard, a court is not to substitute its judgment for that of the agency," GameFly, Inc. v. Postal Regulatory Comm'n, 704 F.3d 145, 148 (D.C. Cir. 2013) (citation and internal quotation marks omitted), nor to "disturb the decision of an agency that has examine[d] the relevant data and articulate[d] . . . a rational connection between the facts found and the choice made." Americans for Safe Access v. DEA, 706 F.3d 438, 449 (D.C. Cir. 2013) (internal quotation marks and citation omitted).  On the other hand, where the agency has not provided a reasonable explanation for its actions, "[t]he reviewing court should not attempt itself to make up for such deficiencies: We may not supply a reasoned basis for the agency's action that the agency itself has not given." State Farm, 463 U.S. at 43 (1983) (citation and internal quotation marks omitted).  A court should nevertheless "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." Id. (quoting Bowman Transp. Inc. v. Arkansas-Best Freight System, 419 U.S. 281, 286 (1974)).

## III.   Analysis

The Court begins, as it must, with standing. Once satisfied of this jurisdictional prerequisite, it next considers Plaintiff's APA claims.  Determining that Resolute prevails on one, the Court thereafter assesses the proper remedy.  It concludes with a brief discussion of the fate of the constitutional questions raised herein.

### A.  Standing

As a threshold matter, Resolute must establish standing to pursue its claims, which Defendants argue it cannot do.  Article III of the United States Constitution limits the jurisdiction of the federal courts to resolving "Cases" and "Controversies."  U.S. CONST. art. III, § 2, cl. 1.  A party's standing "is an essential and unchanging part of the case-or-controversy requirement of Article III." Lujan v. Defenders of Wildlife, 504 U.S. 555, 560 (1992).  To maintain standing, a

plaintiff must, at a constitutional minimum, meet the following criteria.  First, it "must have

suffered an injury in fact — an invasion of a legally-protected interest which is (a) concrete and

particularized . . . and (b) actual or imminent, not conjectural or hypothetical . . . ."  Id. (citations

and internal quotation marks omitted).  Second, "there must be a causal connection between the

injury and the conduct complained of — the injury has to be fairly . . . trace[able] to the

challenged action of the defendant, and not . . . th[e] result [of] the independent action of some

third party not before the court."  Id. (alterations in original) (citation and internal quotation

marks omitted).  Third, "it must be 'likely,' as opposed to merely 'speculative,' that the injury

will be 'redressed by a favorable decision.'"  Id. at 561 (citation omitted).  A "deficiency on any

one of the three prongs suffices to defeat standing."  U.S. Ecology, Inc. v. U.S. Dept. of Interior,

231 F.3d 20, 24 (D.C. Cir. 2000).  In addition, "a plaintiff must demonstrate standing for each

claim he seeks to press. . . ."  DaimlerChrysler Corp. v. Cuno, 547 U.S. 332, 352 (2006).  In the

present case, Resolute brings four causes of action alleging violations of the Constitution (Counts

I-IV), as well as six claims that the USDA violated the Administrative Procedure Act (Counts V-

X).

   For all its causes of action, Resolute's injury-in-fact is straightforward: it has been paying

assessments under the Order, which it claims is unlawful, since January 2012 — at this point, for

over three and a half years.  See Pl. Rep. at 7.  Plaintiff's redressability threshold is similarly

satisfied, since a judgment voiding the Order would alleviate Plaintiff's alleged injury.

Defendants, however, raise two central challenges to Plaintiff's satisfaction of the causation

factor.  First, AMS contends that because the referendum was technically optional — the

Secretary was not required to conduct it before implementing the order — it cannot be said to

have caused Plaintiff's injury.  To similar effect, Defendants relatedly maintain that because the

Secretary has discretion to cancel the Checkoff Order at any time, Resolute cannot show that the operation of the <u>referendum</u> "caused" its injury.  Second, Defendants assert that because Resolute cannot show that the alleged improprieties in the notice-and-comment and referendum procedures "caused" the referendum to be approved, it does not have standing to challenge it. The Court addresses each of these arguments in turn.

> 1. *The Secretary's Discretion*

USDA's primary challenge to Resolute's standing focuses on the discretion the CPRIA grants the Secretary both to call a referendum and to decide whether to implement a checkoff order.  The Secretary may either hold an initial, optional referendum before implementing a proposed order, <u>see</u> § 7417(a)(1), or else implement a required referendum within three years of the first assessments collected under an order.  <u>See id.</u> § 7417(b)(1)-(2).  The Secretary also retains the discretion to suspend or terminate an order <u>at any time</u> under section 7421(a), and USDA contends that he is also not required to authorize a checkoff order — even when it is approved by a referendum.  <u>See</u> Def. Opp./Rep. at 4. Since the Secretary can terminate an Order at any time — the relief Resolute seeks — Defendants maintain that Resolute cannot show that the referendum procedures, as opposed to the Secretary's discretion, caused its injury.  <u>See id.</u> at 3-4.

Plaintiff initially contests whether the Secretary can <u>in practice</u> ignore a referendum approving an order, but even if he could, the Court is not persuaded that this freedom defeats Plaintiff's standing.  This is because, at bottom, the statutory scheme clearly indicates that Congress required the Secretary to obtain industry approval sooner or later.  While he has multiple options under the statute as to <u>when</u> to conduct the referendum, he <u>must</u> eventually hold one and obtain industry approval.

For example, he can implement an order without seeking approval via referendum.  If he takes this approach, however, he must conduct a referendum "not later than 3 years after assessments first begin under the order."  7 U.S.C. § 7417(b)(2).  Alternatively, he can bypass the required (b)(2) referendum if he conducts an "[o]ptional referendum" under § 7417(a)(1) — the choice the Secretary made here.  The CPRIA makes clear, however, that the Secretary must not continue an order that has been disfavored through a referendum.  See id. § 7421(a) (The "Secretary shall suspend or terminate an order . . . if the Secretary determines that the order . . . is not favored by persons voting in a referendum . . . .").  The combined effect of sections 7417 and 7421 is that the Secretary must within three years conduct a referendum and obtain industry approval.  If he does not, he must terminate any order that has already been implemented. Given this, if the referendum in question were unlawful, the Secretary's ability to maintain the Order in the absence of industry approval altogether would be abbreviated at best.  Resolute has been paying assessments since January 2012, see Pl. Rep. at 7, and more than three years has passed since then, so the Secretary would have to have obtained industry approval via referendum by now.  For this reason, the Court is persuaded that Plaintiff has standing to challenge the referendum and Checkoff Order.

## 2.  *But-for Causation of the Referendum*

Defendants' second standing argument is that Resolute cannot demonstrate that, but for the alleged misdeeds of USDA, the referendum participants would have rejected the Order. They claim that Plaintiff has not shown how establishing an incorrect exemption threshold, using an incorrect period to determine eligibility to vote, implementing incorrect procedures during the referendum, permitting the spread of misinformation regarding the terms of the Order, and/or excluding voters from the referendum led to a materially different outcome.  See Def. MTD/MSJ

at 23, 25, 27, 28.  According to Defendants, Resolute's failure to state directly that these defects are the "but for" cause of the referendum's result means that Resolute cannot show that the USDA's actions caused its injury.  See Def. Opp./Rep. at 7.  Plaintiff responds that it need not "overcome the impossible task of proving a referendum on remand would produce a different result."  Pl. Rep. at 5.  It points to 7 U.S.C. § 7418(a), which grants any person subject to an order issued under the CPRIA the right to file a petition with the Secretary stating that an order is not established in accordance with law.  See id. at 5.  And section 7418(b)(1) of the CPRIA grants the district court jurisdiction to review the final ruling on such petitions.

Here, Sugar Cane Growers Co-op. of Florida v. Veneman, 289 F.3d 89 (D.C. Cir. 2002), is instructive.  In that case, the D.C. Circuit held that "[a] plaintiff who alleges a deprivation of a procedural protection to which he is entitled never has to prove that if he had received the procedure the substantive result would have been altered."  Id. at 94. The court reasoned that, otherwise, section 553 of the APA requiring notice-and-comment rulemaking would be "a dead letter," since it would be practically impossible for a plaintiff to show that had she been given the opportunity to submit a comment, a substantively different outcome would have occurred.  See id. at 95.

Although Plaintiff has not provided evidence that "the results of the referendum would have disfavored the Order if the voters allegedly excluded from participation had been permitted to vote or if a different exemption threshold had been used," Def. Opp./Rep. at 7, neither the case law of this Circuit nor the statutory scheme suggest such evidence is required for standing.  Were this not the case, section 7418(b)(1) would similarly be "a dead letter," as few plaintiffs would be able to show that an unlawfully administered referendum would have yielded a different outcome in the absence of the unlawful behavior.  As stated above, Congress clearly desired

14

industry approval of mandatory checkoff orders, and it installed the referendum procedure as a means to ensure it.  It is enough that Resolute alleges that the implemented order — and the referendum conducted to approve it — were "not established in accordance with law."  <u>See</u> 7 U.S.C. § 7418(a)(1)(A).

B.  <u>APA Claims</u>

With this initial brush-clearing exercise completed, the Court now gets to the core of Plaintiff's complaints.  There is some discontinuity between the six counts Plaintiff lays out in its Complaint and the six issues it raises in its Motion for Summary Judgment.  In essence, Resolute's objections to the Order manifest in what are effectively two categories of alleged violations of the APA:  in the first are four claims that AMS acted improperly under the CPRIA, and in the second are two claims in which Resolute contests AMS's interpretation of the Act. The Court follows suit, first separately resolving the four procedural challenges to the rulemaking process, then independently considering Resolute's two interpretive challenges to the terms of the statute itself.

1.  *Notice-and-Comment Procedures*

The parties first scuffle over whether AMS's decision to conduct the referendum was reached in improper fashion.  Resolute identifies three alleged problems in particular: first, AMS improperly treated notice-and-comment proceedings as a mechanistic vote of commenters instead of substantively engaging with the comments; second, AMS gave too much weight to comments submitted by the Blue Ribbon Commission and affiliated individuals; and third, AMS was complicit in the BRC's "misinformation campaign."  <u>See</u> Pl. Opp./MSJ at 33-37.  These claims are barely tenable.

First, Resolute charges that AMS unlawfully and mechanistically used notice-and-comment rulemaking "to determine a majority for or against a proposed rule," id. at 34, instead of substantively engaging with these comments as required by the APA.  To this end, it points to an official press release in which AMS announced that "[i]f the majority of those commenting favored USDA moving forward with a softwood lumber program, prior to final implementation, a referendum would need to be held . . . ."  USDA Seeks Comments on Establishing New Softwood Lumber Research, Promotion, Consumer Education and Industry Information Order, AMS 189-10 (Oct. 1, 2010) (AR2105).  In contrast, the notice in the Federal Register — which also invited comments as part of the notice-and-comment rulemaking — did not reference the need for a majority of comments to be favorable.  See 75 Fed. Reg. at 61,002-16.

AMS received a total of 55 comments — 52 non-duplicative — concerning the proposed Order, and in a subsequent notice, it provided analysis.  It deemed 41 supportive of the proposed Order, seven opposed, three not to have taken a position, and one entirely unrelated.  See 76 Fed. Reg. at 22,770.  Of the 41 supportive comments, AMS designated 27 as supporting the proposed Order without changes and 14 as supporting it with recommended changes.  Id.  In typical notice-and-comment fashion, AMS provided lengthy analysis and consideration of all of these comments.  See id. at 22,770-75.

Given the agency's substantive consideration of the comments it received, it could hardly be said to have treated notice-and-comment rulemaking as "a vote," as Plaintiff contends.  See Pl. Opp./MSJ at 33.  In addition, Defendants rightly note that government press releases are "'Executive Branch communications that express federal policy but lack the force of law' and thus 'are merely precatory.'"  Def. Opp./Rep. at 19 (quoting Barclays Bank v. Franchise Tax Bd., 512 U.S. 298, 330 (1994)); see also CropLife Am. v. E.P.A., 329 F.3d 876, 883 (D.C. Cir. 2003)

(concluding that for press release to be subject to judicial review, it must bind private parties or agency itself with force of law).   Neither the agency's formal notice statement, see 75 Fed. Reg. at 61,002-16, nor its analysis of the comments, see 76 Fed. Reg. at 22,757-84, in any way announce, suggest, or imply that it treated notice-and-comment rulemaking as a straight up-down "vote."   Since both the case law and the agency's practice contravene Plaintiff's stance, the Court concludes that Defendants acted neither arbitrarily nor capriciously in this regard.

Notwithstanding its protest that AMS treated notice and comment as "a vote," Plaintiff also takes issue with the way the Service handled comments from "members of the proponent group" (i.e., the Blue Ribbon Commission), including failing to recognize that some members of the BRC submitted multiple comments under different guises.   See Pl. Opp./MSJ at 35.   Resolute also objects to "USDA officials treat[ing] conditional comments . . . as 'neutral' or supporting, notwithstanding that the changes demanded to the proposed rule generally were not made in the final rule. . . ."   Id.   Neither challenge holds water.

To begin, the APA does not require the agency to incorporate every suggestion made during notice and comment into the final rule.   Such an exacting obligation would grind the federal government to a halt.   "[I]t is settled that 'the agency [is not required] to discuss every item of fact or opinion included in the submissions made to it in informal rulemaking.'"   Pub. Citizen, Inc. v. F.A.A., 988 F.2d 186, 197 (D.C. Cir. 1993) (quoting Automotive Parts & Accessories Ass'n v. Boyd, 407 F.2d 330, 338 (D.C. Cir. 1968)) (alterations in original).   "The agency need only state the main reasons for its decision and indicate that it has considered the most important objections."   Simpson v. Young, 854 F.2d 1429, 1435 (D.C. Cir. 1988).   Nor is it the Court's job to second-guess an agency's determination: "We do not weigh the evidence; we merely examine the record to see if there is evidence, which if accepted by the Secretary,

supports the determination of the agency." <u>Nat'l Soft Drink Ass'n v. Block</u>, 721 F.2d 1348, 1354 (D.C. Cir. 1983). How BRC members submitted their comments, moreover, seems of little moment. At the end of the day, many reams of paper were used as the agency compiled the administrative record, and AMS's published analysis of the comments it received was lengthy and substantial, including its analysis of "Comments Opposed." <u>See</u> 76 Fed. Reg. at 22,773-74. Given this, the Court is more than satisfied that AMS adequately fulfilled its statutory obligation.

Finally, Resolute also raises alleged "misinformation" disseminated by the Blue Ribbon Commission, which it insinuates AMS was "complicit" in propagating. <u>See</u> Pl. Opp./MSJ at 36-37. This misinformation, it complains, was "false, misleading, and contrary to law." <u>Id.</u> Defendants retort that such allegations — given longstanding precedents — fail to state a claim upon which relief can be granted. <u>See</u> Def. Opp./Rep. at 28. They cite to <u>United States v. Rock Royal Co-operative</u>, 307 U.S. 533 (1939), which first established the principle that even if proponents of a marketing order make "widespread public misrepresentations" in connection with the pre-issuance referendum, this alone is not a sufficient basis for relief for parties aggrieved by the Order. <u>See</u> <u>id.</u> at 556. Instead, "the validity of the Act and the provisions of the Order must be assumed," absent "evidence that any [voter] misunderstood" what the Order entailed. <u>See</u> <u>id.</u> at 558.

Here, AMS mailed to each eligible voter a packet including: "(1) a ballot; (2) voting instructions; (3) a description of applicable terms and definitions; (4) a postage-paid, return-addressed envelope; and (5) a summary of the program." Letter from AMS to Softwood Lumber Domestic Manufacturers and Importers (May 16, 2011) (AR2267). Although Resolute provides evidence of misstatements before the referendum took place, <u>see</u> Pl. Opp./MSJ at 36, it provides no evidence that they made their way into the official voter packet, or that they in any way led to

a material misunderstanding by voters.  As the Judicial Officer who rejected Resolute's

administrative appeal noted, "Resolute does not cite any provision of the Administrative

Procedure Act that requires an agency conducting a rulemaking proceeding to refute misleading

statements by proponents or opponents of the rulemaking proceeding." In Re: Resolute, 2014

WL 7534275, at *13.  In light of the presumption established by Rock Royal, and without

evidence that such misstatements materially misled voters, Resolute's claim that AMS acted

improperly here fails.

2.  *Number of Eligible Referendum Voters*

Resolute's second objection is that the agency publicly misrepresented the number of

voters eligible to participate in the referendum.  Plaintiff is particularly concerned that AMS

twice published in the Federal Register that "'about 363 domestic manufacturers and 103

importers would pay assessments under the Order', and thus were eligible to vote," — 466 voters

in total.  See Pl. Opp./MSJ at 28 (quoting 76 Fed. Reg. at 22,757, 22,767 and 76 Fed. Reg. at

46,185, 46,190).  Despite these public pronouncements, Resolute later learned — only after

resorting to a FOIA request to obtain the information — that, in fact, AMS had "privately

determined there were only 311 companies eligible to vote in the referendum." Id. (citing Letter

from Valerie L. Emmer-Scott, USDA FOIA Officer, to Elliot J. Feldman (July 27, 2011)

(AR0999-1004)).  This discrepancy, Resolute argues, is substantial, since the difference

"represents almost the total number of all of the valid ballots AMS received in the referendum"

— 107.  See Pl. Opp./MSJ at 29.  Although Plaintiff does not expressly say so in its briefs, the

Court presumes Resolute to suggest that some sort of impropriety is afoot in leaving out over 100

of the announced eligible voters.

Though the Court agrees that this discrepancy in estimates is awkward, ultimately the agency's actions do not rise to the level of an APA violation, as will be explained. Resolute does identify lamentable mistakes that do not paint the agency in a favorable light, and Defendants compound this poor image by not clearly fessing up to the mistake. Defendants are not clear anywhere in their briefing about exactly how these differing figures came to be — instead, they hide the ball by stating simply that "AMS explained why its prediction . . . did not match the number . . . found eligible to vote in the referendum." Def. Opp./Rep. 27. Resolute is understandably upset by the agency's evasion here, a frustration shared by the Court.

As explained below, the different figures appear to be the result of transposing numbers relating to a different statute — *i.e.*, the Regulatory Flexibility Act, 5 U.S.C. §§ 601 *et seq*. — which requires federal agencies to estimate the impact of any proposed rule on small businesses. Given the complex regulatory environment that modern federal agencies must navigate, it is understandable that such mistakes can and will happen. But Defendants should be forthright in admitting them, rather than forcing the Court to sift through the lengthy administrative record to figure it out. This is especially so considering that the function of judicial review under the APA is to ensure that agencies can provide reasoned explanations for their rulemaking actions, a task made more difficult by a briefing strategy that obscures the agency's reasoning. See E. Alabama Med. Ctr. v. Shalala, 925 F. Supp. 27, 32 (D.D.C. 1996) ("The agency must supply a reasoned basis for its action, supported by substantial evidence on the record . . . .") (citing State Farm, 463 U.S. at 42).

In light of the opacity of Defendants' explanation, the Court independently consulted the excerpted pages of the administrative record provided in the Joint Appendix. Based on the testimony of Sonia Jimenez — then-director of the Promotion and Economics Division of the

Fruit and Vegetable Program of AMS — at the Administrative Hearing, AMS arrived at the

estimate of 363 domestic manufacturers and 103 importers by calculating the number of

manufacturers and importers who sold less than <u>25 million</u> board feet per year.  <u>See</u> Testimony

of Sonia Jimenez at 342-45 (AR3339-42).  This higher board-feet-per-year rate — 25 million as

opposed to the 15 million in the Order — was chosen because a business manufacturing or

importing "25 million feet [per year] would approximately be considered a small business" for

purposes of the RFA.  <u>See id.</u> at 342-43 (AR3339-40); <u>see also</u> Regulatory Flexibility Act, 5

U.S.C. § 602(a)(1) (describing agency reporting requirements for rules that are "likely to have a

significant economic impact on a substantial number of small entities").  After AMS calculated

the number of small businesses who manufacture or import 25 million board feet per year or less,

it seems the Service mistakenly used this figure to estimate the number of domestic

manufacturers and importers that would <u>not</u> be exempted under the Order.  <u>See</u> Testimony of

Sonia Jimenez at 343-45 (AR3340-42).

Although mistakes alone do not rise to the level of an APA violation, the Court is

nonetheless troubled that AMS used <u>both</u> the wrong threshold — 25 million board feet per year

as opposed to 15 million — and also transposed the number of companies <u>not exempted</u> with the

number of companies <u>exempted</u>.  Despite this, the Court is satisfied that such mistakes did not

affect the referendum because AMS fixed the error before it became material.  Shortly before the

referendum was conducted, "AMS made certain inquiries . . . from which it concluded that a

total of 311 domestic manufacturers and importers would be eligible to vote in the referendum."

Def. Opp./Rep. at 27.

Defendants' briefs, unfortunately, never directly identify how AMS ultimately arrived at

the 311 total either.  Clearly explaining the source of the error — and how the correct total was

ultimately obtained — is especially important because only with the complete factual picture can the Court determine whether AMS has a reasoned basis for its actions.  See Shalala, 925 F. Supp. at 32.  Instead, the Court was once more forced to make sense of the abbreviated portions of the administrative record excerpted in the Joint Appendix.  Based on those excerpts provided, the agency seems to have determined the number of eligible voters by consulting with the industry's trade publication Random Lengths,[1] eight of the grading agencies that inspect softwood lumber for compliance with industry standards, and the BRC, making "calls to determine which of those people were eligible to vote, and by Customs data for 2010."  Testimony of Sonia Jimenez at 326 (AR3323).

When all is said and done, the Court does not believe this difference rises to the level of being either arbitrary or capricious, given its ultimately inconsequential nature.  In other words, the Court, is satisfied — just as the Judicial Officer was — that the disparity between the estimate published in the Federal Register and the actual number of ballots sent out does not establish that AMS excluded any eligible voters from participation in the referendum, and Plaintiff has provided no evidence to the contrary.  Although Defendants were not forthright in the source of the error or in how the correct number was obtained, they nevertheless clear the relatively low bar established by the APA.

3.  *Referendum Procedures*

Among the myriad charges Resolute levels at Defendants is that "AMS did not conduct the . . . referendum in accordance with fundamental standards generally accepted by professional

---

[1] In the transcript of Jimenez's testimony at 326 (AR3323), she is reported to have said "random months," rather than "Random Lengths," but this has been corrected in the excerpt provided in the Judicial Officer's decision as "Random Lengths."  See In Re: Resolute, 2014 WL 7534275, at *11.  Random Lengths is the trade publication for the softwood-lumber industry.  See http://www.randomlengths.com/ (last visited Sept. 8, 2015).  Given the correction in the ALJ's ruling, the Court assumes this was merely a transcription error.

survey research methodologists." Pl. Opp./MSJ at 37. Plaintiff yet again raises some genuinely

dismaying problems with AMS's conduct during the referendum, but once more, these charges

do not rise to the level of an APA violation. The CPRIA clearly states that "[a] referendum

conducted under this section shall be conducted in the manner determined by the Secretary to be

appropriate." 7 U.S.C. § 7417(g)(1). Given the broad discretion Congress granted the Secretary,

cf. Freeman v. Hygeia Dairy Co., 326 F.2d 271, 273 (5th Cir. 1964) ("[T]he details of a [similar

checkoff order] referendum, and the manner in which it is conducted, must be left exclusively in

the hands of the Secretary."), Resolute fails to identify clearly how he has fallen short of this

standard.

Instead, in a novel gambit, it points to other regulatory requirements it alleges Defendants

unlawfully neglected to comply with and contends that such omissions constitute violations of

the APA. Like a square peg in a round hole, Resolute's arguments here do not quite fit. Among

them is that AMS's conduct in overseeing the referendum did not comply with purportedly

mandatory USDA departmental regulations, one of which establishes rules related to "the

collection of information and recordkeeping requirements imposed by USDA agencies on

individuals . . . ." USDA Departmental Regulation No. 3410-001 (Information Collection

Activities — Collection of Information from the Public, May 6, 2009) at 1 (AR1138). Yet

Resolute does not plainly connect the dots as to how AMS fell short of DR 3410-001 and what

consequences should follow under the APA or the CPRIA. Instead, it simply raises incidental

issues such as the fact that "USDA did not have the ballots [for eligible voters in Québec]

translated into French, which is the official language of Québec." Pl. Opp./MSJ at 41. This

would hardly pose an inconvenience to companies that actively participate in U.S. markets by

importing millions of feet of softwood lumber per year, and Resolute does not even identify just

how this is an action required under DR 3410-001, let alone one whose omission warrants

vacating the entire Checkoff Order.

Though the parties never spell it out clearly, to the Court's best understanding, DR 3410-001 appears to have been promulgated in furtherance of the Paperwork Reduction Act, 44 U.S.C. §§ 3501-3521.  The PRA "requires agencies to provide detailed justification and supporting explanations of how the information will be collected and why the information collection is essential to an agency's mission."  DR3410-001 at 12 (AR1149).  AMS's conduct here, however, was aimed at satisfying the CPRIA's referendum requirement — not to initiate a "set of questions or recordkeeping requirements . . . used by Federal agencies to collect information for statistical purposes . . . ."  Id.  Even if the Secretary did somehow violate DR 3410-001 in conducting the referendum — a picture that Resolute has not colored in with sufficient detail — Resolute also does not elucidate why such violations are so material as to render the entire Checkoff Order void, rather than simply making the USDA susceptible to whatever sanctions may arise under DR 3410-001 or the PRA.  See, e.g., id. at 5 (AR1142) ("Failure to meet such obligations places the Department at risk of incurring a paperwork violation.").

In a similar vein, Plaintiff argues that AMS was subject to Office of Management and Budget guidelines "as to the manner in which it collects information through a referendum."  Pl. Opp./MSJ at 39.  In particular, Resolute argues that this means that Defendants are required to turn over the list of eligible voters to whom AMS sent ballots during the referendum.  See Compl., ¶ 190-91.  Defendants disagree, and so does the Court.  Resolute states that OMB guidelines apply without articulating why.  In contrast, Defendants clearly identify that "OMB Standards apply by their terms to 'statistical survey[s],' i.e., to 'census[es],' 'sample[s] of . . . target population[s],' or other 'data collection[s] whose purposes include the description,

24

estimation, or analysis of the characteristics of groups, organizations, segments, activities, or

geographic areas.'" Def. Opp./Rep. at 26 (quoting Office of Management Budget Standards and

Guidelines for Statistical Surveys 35 (Sept. 2006) (AR1206)) (alterations in original).  The Court

does not understand the purpose of a referendum conducted in furtherance of the CPRIA to be

one of "description, estimation, or analysis of the characteristics of" the softwood-lumber

industry.  See id.  Neither did the judicial officer reviewing the administrative law judge's denial

of Resolute's claims.  See In Re: Resolute, 2014 WL 7534275, at *15 ("The Softwood Lumber

Order initial referendum was not a census . . . [, and] Office of Management and Budget

Guidelines related to data collection are not relevant to [it] . . . .").  AMS's purpose was to

conduct an anonymous thumbs-up, thumbs-down vote on the proposed Checkoff Order.  Given

the broad discretion the Secretary has to conduct this referendum, as discussed at length above,

Resolute's argument here crumbles.

### 4. *Representative Period for Referendum Voter Eligibility*

Next among Resolute's complaints is that the Department acted unlawfully in

determining the "representative period" for referendum voter eligibility.  See Pl. Opp./MSJ at 31-

32.  It challenges the Secretary's use of the "representative period" of January 1-December 31,

2010, to determine eligibility for participation in the referendum.  Plaintiff argues that because

the "representative period" specified — calendar year 2010 — was the "worst year of softwood

lumber production and importation in, perhaps, 30 years, . . . [it] therefore was not a

'representative period' as required by" the CPRIA.  See id. at 32 (quoting 7 U.S.C. § 7417(a)(1)).

The agency is once more squarely in the right.  The CPRIA could not be clearer in

delegating broad discretion to the Secretary: "a representative period [as] determined by the

Secretary."  7 U.S.C. § 7417(a)(1).  The Secretary's explanation for this selection — that

"January 1-December 31, 2010, was the most recent calendar year preceding the pre-issuance referendum" — is manifestly reasonable.  See Def. Opp./Rep. at 24.  Although 2010 in retrospect was a peculiar year for the industry, as Plaintiff itself acknowledges, "such uncertainty may always exist in programs spanning years . . . ."  Pl. Opp./MSJ at 33.  Under APA review, the Court's role is not to second-guess an agency when it has provided a reasonable explanation, see State Farm, 463 U.S. at 43, and so Resolute's argument fails on this count as well.

### 5.  *Certifying Approval of the Referendum*

In addition to the aforementioned four APA challenges, Resolute also raises two issues with AMS's actions that involve its interpretation of the CPRIA.  Both challenge the Secretary's interpretation of potentially ambiguous statutory terms.  "When a court reviews an agency's construction of the statute which it administers, it is confronted with two questions."  Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837, 842 (1984).  "First, applying the ordinary tools of statutory construction, the court must determine 'whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear[,] . . . the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress.'"  City of Arlington, Tex. v. FCC, 133 S. Ct. 1863, 1868 (2013) (quoting Chevron, 467 U.S. at 842-43).  However, "if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute."  Chevron, 467 U.S. at 843.

Plaintiff's first interpretive challenge is that AMS did not comply with any of the CPRIA's permitted pathways to obtain industry approval of an order.  The statute instructs:

> An order may provide for its approval in a referendum—
> (1) by a majority of those persons voting;
> (2) by persons voting for approval who represent a majority of the
> volume of the agricultural commodity; or
> (3) by a majority of those persons voting for approval who also
> represent a majority of the volume of the agricultural commodity.

7 U.S.C. § 7417(e).  In reading the three statutory options together, the Court understands option

(e)(1) to require a simple numerical majority of those responding in the referendum.  In contrast,

option (e)(2) appears to enable a numerical minority to approve an order if its controls a majority

share of the volume of the commodity.  Option (e)(1) thus gives comparatively more power to

the referendum's smaller and more numerous manufacturers and importers, while option (e)(2)

gives comparatively more power to the largest market participants.  Option (e)(3) appears to

incorporate aspects of each: both a numerical majority and a majority of the commodity volume

must approve the referendum, ensuring that neither numerous small players nor a few large

players could approve an Order over the objection of the others.  Since the CPRIA potentially

applies to checkoff orders for various different agricultural commodities, it makes sense that

Congress would grant the Secretary discretion to use different approval thresholds depending on

the size and number of market participants of a given commodity.

In announcing the proposed Order, AMS stated that "[a] majority of entities by both

number and volume would have to support the program for it to be implemented."  75 Fed. Reg.

at 61,013.  It later gave notice of the proposed referendum by stating that "[t]he program would

be implemented if it is favored by a majority of those voting in the referendum who also

represent a majority of the volume of softwood lumber represented in the referendum."  76 Fed.

Reg. at 22,757 (emphasis added).  Resolute contends that this means that AMS effectively

selected option (e)(3), and it objects to this choice because "a majority of the volume of the

agricultural commodity," 7 U.S.C. § 7417(e)(3), is meaningfully different from "a majority of

the volume of softwood lumber represented in the referendum," the language used in the Federal

Register.  See Pl. Opp./MSJ at 30-31 (emphasis added).

      Defendants appear to agree that AMS selected option (e)(3), but argue that because the

CPRIA is "silent" on the issue of the definition of "volume of the agricultural commodity," as

used in both sections 7417(e)(2) and (e)(3), ambiguity in the meaning of this phrase provides the

Secretary with discretion to choose any definition of "volume" that is "based on a permissible

construction of the statute."  Def. Opp./Rep. at 31.  Since "persons voting" need not be

"everyone in the United States who produces or imports the commodity to which the Checkoff

Order pertains" — but only those who will be assessed under a proposed order — Defendants

argue that it is permissible to interpret "volume" in sections 7417(e)(2) and (e)(3) to be "the

volume of the commodity represented in the referendum."  Id. at 31 (emphasis added).

      The Court agrees that sufficient ambiguity exists in the meaning of the term "volume" to

satisfy Chevron step one and entitle the agency to deference at Chevron step two.  On its face,

the term "volume" in sections 7417(e)(2) and (e)(3) does not obviously refer to either the total

volume of all manufacturers and importers in the marketplace or merely the volume of those

participating in the referendum.  And in light of Chevron deference due to an agency's

construction of an ambiguous statutory term, the Court shares Defendants' view that this is a

permissible one, both for the reason just stated, and for another.

      Under this reading of section 7417(e), Plaintiff's proposed interpretation of option (e)(3)

would set an almost impossibly high floor to achieve approval via referendum, rendering it a

nonstarter.  This is because the portion of the market volume produced or imported by exempted

entities would function as a "no" vote, since these entities could not vote in the referendum.  If

Plaintiff is right, the exempted volume would become part of the denominator for calculating majority passage under a referendum, but could never be part of the numerator.

One example suffices to demonstrate this problem.  If 25 percent of the total volume of softwood lumber were exempted from a proposed order, the approval percentage by volume among entities participating in the referendum would have to increase substantially.  Indeed, approval from entities representing more than two-thirds of the volume in the referendum (50 percent of the total volume, but 67 percent of the volume participating in the referendum) would be required to achieve majority approval by total volume.  This interpretation seems dubious, as it is unlikely that Congress would desire to effectively give unwitting veto power to those not even assessed under the order or participating in the referendum.  It would be bizarre that a majority of voters by number and by volume could approve the referendum but still have the Order rejected.  Instead, option (e)(3) appears to incorporate both the protection for numerous small market participants in (e)(1) and the protection for a few large market participants in (e)(2), something Plaintiff's interpretation would thwart by watering down the larger market participants' share of the volume in the referendum.

Given Defendants' eminently reasonable interpretation, this construction of the CPRIA more than satisfies the Chevron step-two deference due the agency, and the Court believes AMS acted permissibly by establishing majority approval on the basis of both number and volume of participants in the referendum.

### 6.  *15 Million-Board-Feet Exemption*

Given the laundry list of issues Plaintiff has raised with the Checkoff Order, it might appear that its claims founder entirely.  Yet on one final issue, Resolute's challenge is more formidable.  This is Plaintiff's argument that AMS violated the CPRIA by failing to choose an

exemption threshold — in this case, the 15 million-board-feet-per-year exemption — that was "de minimis."  <u>See</u> Pl. Opp./MSJ at 25.  The CPRIA permits the Secretary to "exempt from the order any de minimis quantity of an agricultural commodity otherwise covered by the order."  7 U.S.C. § 7415(a)(1).  Resolute notes that AMS has stated that it does not know the quantity of the commodity <u>exempted</u> from the order, <u>see</u> Testimony of Sonia Jimenez at 421, 503 (AR3418, AR3500); the total quantity of the agricultural commodity <u>in existence</u>, <u>see</u> <u>id.</u> at 420-21 (AR3417-18); or the <u>number</u> of companies excluded.  <u>See</u> <u>id.</u> at 376-77 (AR3373-74).  On this basis, Resolute contends that AMS does not and cannot know whether the quantity it exempted was a "de minimis quantity."  <u>See</u> Pl. Opp./MSJ at 25.

Defendants respond that the agency has stayed within the bounds of its statutory authority by selecting an alternative basis for determining the meaning of a "de minimis quantity."  The Secretary asserts that the CPRIA is "silent" as to the definition of the term "de minimis" and thus its meaning is "ambiguous," so he is entitled to choose any permissible definition.  <u>See</u> Def. Opp./Rep. at 22.  Defendants also promote a broader understanding of a reasonable "de minimis quantity" on the basis that the term is preceded by the word "any."  According to them, "any" implies that the term "de minimis quantity" clearly may have more than one acceptable definition.  <u>See</u> <u>id.</u> at 22-23.  While the Court agrees with Defendants' position up to this point, their argument is rather facile; the question is not whether "de minimis quantity" might permissibly vary from checkoff order to checkoff order — which it almost surely must.  Rather, the question is whether 15 million board feet per year is one such permissible interpretation.

In answer to <u>this</u> question, the Court believes that Defendants are either hiding the ball or else are ill informed — neither of which is particularly encouraging for an entity that acts with the force of law.  As stated, Defendants claim that it is "impossible for us to know the total

volume of softwood lumber," id. at 23 (quoting Testimony of Sonia Jimenez at 421 (AR3418))
(internal quotation marks omitted), rendering it equally impossible to calculate a "de minimis
quantity" of the total volume in the marketplace.  The Court is skeptical that obtaining such
information is "impossible," in part because this seems highly unlikely for an industry that is
both well regulated and substantial in size.  See, e.g., 76 Fed. Reg. 22,758-59 (providing figures
for the total U.S. softwood-lumber market in tens of billions of board feet per year for the
calendar years 2003 through 2009).

Establishing the proper exemption threshold almost surely required knowledge of the
total volume of softwood lumber.  Defendants justified the 15-million-board-feet exemption on
the ground that it would generate sufficient revenue among the remaining manufacturers and
importers who would be assessed, an outcome that apparently would be in doubt with an
exemption threshold of 20 or 30 million.  See 75 Fed. Reg. at 61,013.  How could the BRC and
AMS make these comparative calculations unless they knew enough about the entire quantity of
softwood lumber manufactured or imported so as to divide that total into non-exempted and
exempted portions?  Either the BRC, AMS, or both must have had at least some working
estimate of the total volume of softwood lumber.

At least two documents in the Joint Appendix submitted by the parties suggest such
figures were obtainable or had been obtained.  First, the BRC — in a pamphlet advocating for
approval in the referendum — provided data as to why the 15 million-board-feet exemption was
neither "too low" nor "too high."  See 20 Myths and Facts About the Softwood Lumber
Checkoff, Blue Ribbon Commission for Check-off at 3 [hereinafter "20 Myths"] (AR0929).
Presumably, the BRC could only have made this assessment if it had data on the entire industry's
production of softwood lumber in a given year.  The BRC noted that an exemption for the first

100 million board feet per year would have eliminated "a total of 18.45 billion feet, and only 58% of shipments would participate in the check-off . . . ."  Id.  Similarly, it observed that an exemption for the first 15 million board feet per year would exempt roughly 11% of annual production and "allow the check-off to capture about 90% of production."  Id.

Second, AMS's proposed rule establishing the Checkoff Order included an estimate that "[o]f the 595 domestic manufacturers, . . . about 232, or 39 percent, ship less than 15 million board feet per year and will thus be exempt from paying assessments under the Order."  76 Fed. Reg. at 46,190.  It further estimated that "[o]f the 883 importers . . . 780, or 88 percent, import less than 15 million board feet per year and will also be exempt from paying assessments."  Id. It then calculated that "if $17.5 million were collected in assessments ($0.35 per thousand board feet assessment rate with 50 billion board feet assessed), 25 percent, or about $4 million, will be paid by importers and 75 percent, or about $13 million, will be paid by domestic manufacturers." Id.  If AMS could estimate the total revenue generated from the non-exempted softwood lumber, and if it knew how much more would be exempted by the 15-million threshold, then how could it not know the total quantity manufactured or imported?  It is simply not plausible that it is "impossible to know" the total volume of softwood lumber when the chosen exemption threshold was determined on the basis of data that almost surely required knowledge of it.  This impossibility claim was made by only one agency representative — Sonia Jimenez, a department head of the Fruit and Vegetable division of AMS — so it is not even clear whether this view was widely shared by others in AMS or by the BRC.

Even if Defendants are being forthright, and obtaining this information truly is "impossible," they still must provide a reasoned explanation for their interpretation of "de minimis quantity" as being 15 million board feet per year — a quantity sufficient to build

approximately 1,000 homes.  See In Re: Resolute, 2014 WL 1993757, at *6.  They propose an

entirely different calculus: given Congress's assumed desire for checkoff programs to run

successfully, and in light of the agency's broad interpretive leeway to fulfill this ambition, "de

minimis quantity" may refer to any quantity that would "'generate sufficient income to support

an effective promotion program for softwood lumber.'"  Def. Opp./Rep. at 23 (quoting 75 Fed.

Reg. at 61,013).  AMS argues that other contemplated exemption thresholds — such as 20

million or 30 million board feet per year — would not have generated adequate revenue to

support the checkoff program, since many more companies would have been exempted from

paying assessments under the Order.  See id. at 23; 75 Fed. Reg. at 61,013.  Defendants contend

that since "Congress would have favored an effective promotion program for softwood lumber,"

Def. Opp./Rep. at 23 (internal quotation marks omitted), if 15 million was an exemption

threshold that would achieve an effective checkoff order, then this is "based on a permissible

construction" of the statute.  Id.

　　　Defendants' argument is dubious for several reasons.  First, their interpretation renders

"de minimis" superfluous in the context of the statute.  If Congress had really wanted to ensure

that the Secretary had the means to effectuate an effective checkoff order at all costs, it could

have just granted the Secretary carte blanche to issue any exemption threshold he wanted.  Since

Congress did not — and instead capped permissible exemptions only at "de minimis" quantities

— it clearly did not intend the Secretary have such unfettered discretion.  Second, while the

phrase "de minimis quantity of an agricultural commodity," 7 U.S.C. § 7415(a)(1), is ambiguous

with respect to precisely what quantity may reasonably be considered "de minimis," the term "de

minimis" is not itself entirely ambiguous.  "The inquiry here begins 'where all such inquiries

must begin: with the language of the statute itself.'"  Loving v. IRS, 917 F. Supp. 2d 67, 74

(D.D.C. 2013), aff'd, 742 F.3d 1013 (D.C. Cir. 2014) (quoting Caraco Pharm. Labs., Ltd. v.

Novo Nordisk A/S, 132 S.Ct. 1670, 1680 (2012)) (internal citation and quotations omitted).  A

leading dictionary defines the term "de minimis" to mean "[o]f little importance; insignificant."

See American Heritage Dictionary (5th ed. 2011).  So an exemption quantity chosen that is very

large would not be "of little importance" or "insignificant."  Further, the "de minimis quantity"

in question is the "de minimis quantity of an agricultural commodity," 7 U.S.C. § 7415(a)(1)

(emphasis added) — not the quantity of revenue generated.  In other words, what the CPRIA

permits is exemptions of quantities of an agricultural commodity that are of numerically "little

importance" or "insignificant" in themselves.  While Defendants are correct that precisely what

quantity may be considered "de minimis" is ambiguous and therefore left to agency discretion to

determine, the structure of the sentence makes clear that whatever quantity the agency chooses, it

must justify this on the basis that the quantity is of little importance or is insignificant.

Given the definitions of "de minimis" provided above, Defendants' interpretive stance

strains credulity.  In theory, the Defendants' interpretation would permit an exemption high

enough to exempt all but the industry's largest players (say, the top 3% of companies by

volume), if assessments from those entities alone could generate sufficient revenue for a

marketing program.  Coupled with an assessment rate high enough to generate sufficient

revenue, this exemption threshold would be permitted under Defendants' proposed meaning of

"de minimis quantity."  Yet it would clearly contravene any plain meaning of "de minimis" if it

could exempt nearly the entirety of the quantity of the agricultural commodity.[2]

---

[2] Since only those assessed under a proposed checkoff order are entitled to vote in a referendum, it is questionable
whether the hypothetical entities would approve an assessment levied only at them.  Nevertheless, from the
standpoint of interpreting "de minimis quantity," this is irrelevant.

At bottom, the Court does not believe the explanation provided in the agency's briefs for its interpretation of "de minimis quantity" is a "permissible interpretation" as required by Chevron.  See Chevron, 467 U.S. at 843 ("[I]f the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute.").  Although the Court does not find merit with Resolute's many other APA claims, on this one count it has the better of the argument.

C.  Remand Without Vacatur

The question, then, is how next to proceed.  "Given the deficienc[y] . . . , the Court must determine the proper remedy: to remand with vacatur, to remand without vacatur, or to vacate with no remand."  Conservation Law Found. v. Pritzker, 37 F. Supp. 3d 254, 270 (D.D.C. 2014).  Ordinarily, "[w]hen a Court identifies an infirmity in a rule, vacatur and remand is the 'normal' remedy."  Sec. Indus. & Fin. Markets Ass'n v. United States Commodity Futures Trading Comm'n, 67 F. Supp. 3d 373, 434 (D.D.C. 2014) (citing Allina Health Servs. v. Sebelius, 746 F.3d 1102, 1110 (D.C. Cir. 2014)).  In the decades since Chevron and State Farm deference have been articulated, however, this Circuit has recognized that in certain instances, "an inadequately supported rule . . . need not necessarily be vacated."  Allied-Signal, Inc. v. U.S. Nuclear Regulatory Comm'n, 988 F.2d 146, 150 (D.C. Cir. 1993); see also Pritzker, 37 F. Supp. 3d. at 271.  "The decision whether to vacate depends on the seriousness of the order's deficiencies (and thus the extent of doubt whether the agency chose correctly) and the disruptive consequences of an interim change that may itself be changed."  Allied-Signal, 988 F.2d at 150-51 (citation and internal quotation marks omitted).  "Moreover, remand without vacatur is appropriate where 'there is at least a serious possibility that the [agency] will be able to substantiate its decision on

remand.'"  Nat'l Parks Conservation Ass'n v. Jewell, 62 F. Supp. 3d 7, 20 (D.D.C. 2014)

(quoting Allied-Signal, 988 F.2d at 151).

Such a possibility seems likely here for several reasons.  First, as discussed above, the

CPRIA is an unusual statute in that industry representatives — in this case, the Blue Ribbon

Commission — participate in a substantial capacity in developing and promulgating a proposed

checkoff order.  See 75 Fed. Reg. at 61,002 ("The proposal was submitted to USDA by the Blue

Ribbon Commission (BRC), a committee of 21 chief executive officers and heads of businesses

. . . ."); 7 U.S.C. § 7413(b)(1)(B)(i) ("A proposed order with respect to an agricultural

commodity may be . . . submitted to the Secretary by . . . an association of producers of the

agricultural commodity; . . .").  While the USDA is still responsible for "determin[ing] that a

proposed order is consistent with and will effectuate the purpose of this subchapter," id.

§ 7413(b)(2), it is understandable that the Secretary may not be as familiar with the details of

every step in the analytical process along the way.  This is particularly so in this case, where

Resolute has launched a full frontal assault against the CPRIA and the Checkoff Order on both

constitutional and APA grounds.  Given the ten counts Resolute brought in its Complaint,

Defendants' 38-page Opposition to Plaintiff's Cross-Motion for Summary Judgment was

admirable in its concision considering the many issues that it had to address.  Indeed, Defendants

devoted only two paragraphs to oppose summary judgment on the issue of the "de minimis

quantity" interpretation.

Whether remand without vacatur is appropriate turns on "the extent of doubt whether the

agency chose correctly . . . ."  Allied-Signal, 988 F.2d at 150.  While the Court finds Defendants'

"impossibility" defense unsatisfactory and its proposed interpretation of "de minimis quantity"

as any that "would generate sufficient income to support an effective promotion program" not

permissible on the basis of the explanation so far provided, see Def. Opp./Rep. at 23, the Court

suspects other rationales not briefed may turn up a better — and certainly permissible — account

of "de minimis quantity."

The Court independently identified information included in the Joint Appendix that

seems to point the way toward at least one plausible account of the Secretary's implementation

of "de minimis quantity" in the Checkoff Order.  In the Blue Ribbon Commission's "20 Myths"

pamphlet circulated to softwood-lumber manufacturers and importers ahead of the referendum,

the BRC explained that the 15 million-board-feet-per-year exemption was "de minimis as far as

free riders is concerned."  20 Myths at 3 (AR0929) (emphasis added).  The Court speculates that

this means that this level of exemption would not exempt so many producers that those

remaining — who would not be exempted — would perceive the others to be free riding by

receiving the benefits without having to pay for them.  After all, the free-rider problem is largely

what spurred the creation of government-operated (and thus compulsory) checkoff programs in

the first place.  See supra Section I.B.  The BRC also noted that this exemption threshold

"relieves the administrative burden from 200 of the smallest companies."  20 Myths at 3

(AR0929).  Such an explanation — if true and substantiated by the record — seems far more

likely to satisfy Chevron step-two review than that provided by the agency in its trim briefs here.

The second consideration in determining whether to remand without vacatur is "the

disruptive consequences of an interim change that may itself be changed."  Allied-Signal, 988

F.2d at 150-51; see also Pritzker, 37 F. Supp. 3d at 270-71.  This factor also weighs in favor of

remand without vacatur here.  As the entire Background section above indicates, the checkoff

program was not developed hastily; to the contrary, it took years between the time of the first

discussions about a checkoff program in 2008 and the ultimate Order implemented after a

majority of voters approved it in the 2011 referendum.  "[C]ases that involve fee collection or

payment distribution," moreover, are particularly appropriate for remand without vacatur.  See

Kristina Daugirdas, Evaluating Remand Without Vacatur: A New Judicial Remedy for Defective

Agency Rulemakings, 80 N.Y.U. L. Rev. 278, 298 (2005). This is especially true in the case of

"agency collection of fees," including those involving the Department of Agriculture.  See id.;

see also Milk Train, Inc. v. Veneman, 310 F.3d 747, 756 (D.C. Cir. 2002) (remanding without

vacatur the Secretary's implementation of a subsidy program for milk producers), Sugar Cane

Growers Cooperative of Florida v. Veneman, 289 F.3d 89, 98 (D.C. Cir. 2002) (remanding

without vacatur the Secretary's implementation of a payment-in-kind program for sugar crop).

Here, non-exempted manufacturers and importers have been paying assessments since

2012, and that money has presumably been spent on "research, promotion, consumer education

and industry information" in order to "strengthen the position of softwood lumber in the

marketplace, maintain and expand markets for softwood lumber, and develop new uses for

softwood lumber within the United States."  76 Fed. Reg. at 46,185.  Prematurely vacating the

Checkoff Order would effectively nullify these efforts and raise questions about whether all

participants who paid into it deserve the remedy Resolute here seeks: "restitution for all spent

funds collected from Plaintiff through assessments."  Pl. Opp./MSJ at 47.  While this may

ultimately be the appropriate remedy, the Court thinks it prudent not to vacate the Order due to a

failure to provide a sufficient explanation of a chosen interpretation of a statutory term,

particularly where alternative explanatory accounts seem likely to exist elsewhere in the

administrative record, and where the threshold was not determined by the agency alone.

D.   Constitutional Claims

Having navigated Resolute's throng of APA claims, its constitutional claims remain. These include allegations that the CPRIA unconstitutionally delegates executive authority to referendum participants, that the USDA's application of the CPRIA does the same, that the USDA also unconstitutionally delegates legislative authority to referendum participants, and that it violates the Due Process rights of producers and importers (Counts I-IV).   In light of the Court's decision to remand to the agency for further explanation of its decision to implement a 15 million-board-feet-per-year exemption threshold, however, the Court need not address these constitutional questions here.   Pursuant to the principle of constitutional avoidance, a court shall "resolve statutory questions at the outset where to do so might obviate the need to consider a constitutional issue."   U.S. v. Wells Fargo Bank, 485 U.S. 351, 354 (1988); see also Heller v. Dist. of Columbia, 670 F.3d 1244, 1250 (D.C. Cir. 2011) (same).   Resolute's constitutional claims must await another day.

IV.     **Conclusion**

Because most portions of the Checkoff Order and the accompanying rulemaking process clearly satisfy APA review, the Court will grant Defendants' Motion for Summary Judgment in part (as to Counts VI-X) and deny it in part (as to Count V).   Count V will be remanded without vacatur to the Department of Agriculture for a reasoned and coherent treatment of the decision to select a 15 million-board-feet-per-year exemption as the "de minimis quantity" exemption in accordance with 7 U.S.C. § 7415(a)(1).   Finally, because the Court remands the case with questions outstanding as to whether the Checkoff Order passes muster under APA review, it declines at this time to render judgment on Plaintiff's constitutional claims.   A separate Order will so state.

/s/ James E. Boasberg
JAMES E. BOASBERG
United States District Judge

Date:  September 9, 2015