UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **RESOLUTE FOREST PRODUCTS, INC.,**<br><br>   **Plaintiff,**<br><br>   v.<br><br>**U.S. DEPARTMENT OF AGRICULTURE,** *et al.*,<br><br>   **Defendants.** | Civil Action No. 14-2103 (JEB) |

## MEMORANDUM OPINION

After three Opinions, the Court has finally chopped this case all the way down to its stump. All that remains is the determination of a remedy. Yet just as the roots of the tree are often tricky to yank out, such is the predicament here. This dispute involves Defendant U.S. Department of Agriculture's so-called Softwood Lumber Checkoff Order, which authorized its Softwood Lumber Board to collect assessments from lumber companies and then to spend those funds on marketing efforts on behalf of the softwood-lumber industry as a whole. Plaintiff Resolute Forest Products, Inc., which was assessed some $1.1 million since the Order went into effect in 2011, challenged the Department's Order as unlawfully promulgated. This Court ultimately agreed. See Resolute Forest Prods., Inc. v. U.S. Dep't of Agric. (Resolute III), No. 14-2103, 2016 WL 2885869 (D.D.C. May 17, 2016).

Resolute now asks for its money back. That simple request, however, is laden with complicated questions of sovereign immunity, the statutory authority for relief, and considerations of equity. Following a status hearing, submissions on the remedies question, and

1

supplemental Court-ordered briefing, the Court ultimately determines that a full refund of the illegal assessments is indeed due.

**I.    Background**

Prior Opinions have mostly set the backdrop for the latest spat between Resolute and the Department of Agriculture as well as its Secretary, Tom Vilsack (the two of which the Court will refer to jointly as Defendant).  See Resolute III, 2016 WL 2885869, at *1-3; Resolute Forest Prods., Inc. v. U.S. Dep't of Agric. (Resolute II), No. 14-2103, 2016 WL 1714312, at *1 (D.D.C. Feb. 2, 2016); Resolute Forest Prods., Inc. v. U.S. Dep't of Agric. (Resolute I), 130 F. Supp. 3d 81, 86-88 (D.D.C. 2015).  Even so, because none of those dispositions focused on remedial issues, the Court sketches in a few added details.

A.    The CPRIA and Softwood Lumber Checkoff Program

"Congress has long regulated the promotion and sale of agricultural commodities by enabling the federal government to coordinate with industries to advance such promotional efforts."  Resolute I, 130 F. Supp. 3d at 86.  Everything from kiwifruit to popcorn is subject to federal marketing orders.  See 7 U.S.C. §§ 7461-7491.

At issue here is softwood lumber.  For that product, the Commodity Promotion, Research, and Information Act of 1996 (CPRIA), id. §§ 7411-7425, empowers the Secretary to issue an order that creates an industry-led board and allows that board to collect assessments from lumber companies so that it can engage in marketing campaigns for the industry as a whole. See id. §§ 7413(a), 7414(b), (c)(1); Resolute I, 130 F. Supp. 3d at 87.  To protect small-volume lumber distributors and minimize administrative costs, the Secretary may specify in that order that a "de minimis quantity of an agricultural commodity" produced annually by each company is exempt from these fees.  See 7 U.S.C. § 7415(a)(1).

In the present case, the Secretary's Softwood Lumber Checkoff Order — promulgated in 2011 following notice-and-comment rulemaking — did precisely these things. First, the Checkoff Order established the Softwood Lumber Board to carry out lumber-promotion activities. See Softwood Lumber Research, Promotion, Consumer Education and Industry Information Order, 76 Fed. Reg. 46,185 (Aug. 2, 2011). Next, to fund those activities, the Checkoff Order required industry members that trafficked in more than a *de minimis* quantity of softwood lumber — specifically, 15 million board feet (15mmbf) per fiscal year — to pay assessments to the Board. See Resolute I, 130 F. Supp. 3d at 87; see also 7 U.S.C. § 7415(a)(1). Those members producing less are exempt from such fees.

As certain as taxes are, few are keen to pay the toll. Suspecting as much, the CPRIA provides a legal mechanism for companies to object to a checkoff order. Relevant here, the Act allows disgruntled members to bring administrative, and then judicial, challenges to an order. The statute provides, first, for administrative relief:

> A person subject to an order issued under this subchapter may file with the Secretary a petition —
>
> **(A)**  stating that the order, any provision of the order, or any obligation imposed in connection with the order, is not established in accordance with law; and
>
> **(B)**  requesting a modification of the order or an exemption from the order.

Id. § 7418(a)(1). Once the Secretary rules on the petition, federal district courts then have "jurisdiction to review the final ruling on the petition of the person." Id. § 7418(b)(1). If the order is unlawful, however, courts have a choice of remedies:

> If the court determines that the ruling is not in accordance with law, the court shall remand the matter to the Secretary with directions —

> **(A)** to make such ruling as the court determines to be in accordance with law; or
>
> **(B)** to take such further action as, in the opinion of the court, the law requires.

Id. § 7418(b)(3).

    B. Resolute's Challenge

After following this trail of statutory breadcrumbs, here Resolute is. Once the Softwood Lumber Checkoff Order was approved, the company filed its petition with the Secretary to review that Order. That petition was twice rejected, however, first by an Administrative Law Judge and then by a Judicial Officer acting on behalf of the Secretary. See In re Resolute Forest Prods., No. 12-40, 2014 WL 1993757 (U.S.D.A. Apr. 30, 2014); In re Resolute Forest Prods., No. 12-40, 2014 WL 7534275 (U.S.D.A. Nov. 26, 2014).

In December 2014, Plaintiff sought judicial review through this lawsuit, enumerating a number of constitutional and administrative objections to the Checkoff Order. Part of its Complaint challenged the 15mmbf *de minimis* exemption as an arbitrarily selected threshold. See ECF No. 1 (Complaint), ¶¶ 111, 116, 151-55. As relief, Resolute requested "an order instructing USDA to cease the collection of Softwood Lumber Order assessments and refund all unspent funds collected from Plaintiff" and "an order requiring USDA to make restitution for all spent funds collected from Plaintiff." Id. at 40 (emphases added). In short, Resolute wanted all of its money back.

In three Opinions this past year, this Court dealt with the substance of Plaintiff's suit. Resolute I concluded that the Department's setting of the *de minimis* exemption did not pass administrative-review muster and so "remanded without vacatur to the Department of Agriculture for a reasoned and coherent treatment of [its] decision." 130 F. Supp. 3d at 105; see 7 U.S.C. § 7418(b)(3)(A). The Department fared no better on remand, as this Court, in Resolute

4

II, still was not assured that the agency had relied on "some verifiable source of data [that] accurately depicted the softwood-lumber market and supported the selection of 15 million board feet as the appropriate *de minimis* quantity." 2016 WL 1714312, at *3. The Court then ordered the Secretary to provide supplemental information to bolster that threshold. Id. at *4.

Only after the Department's third unsuccessful explanatory attempt did the Court fell the Checkoff Order. In Resolute III, it concluded that the Department's selection of the "*de minimis* quantity was arbitrary and capricious and that, accordingly, the Checkoff Order was promulgated unlawfully." 2016 WL 2885869, at *19. The Court then ordered the parties to attend a hearing "to discuss the appropriate next steps concerning the remedies sought by Plaintiff." Id.

The resulting issue of whether Resolute is entitled to a refund — as it had asked for in its Complaint — has proved rather complex. After a hearing, the Court initially enjoined the Department and the Board from collecting further assessments from Plaintiff and from maintaining a balance of less than $1.1 million, in the event a refund was appropriate. See 6/1/16 Minute Order.

In that same Order, the Court asked the parties to address the remedies question, which resulted in additional briefing along with supplemental authorities. See ECF Nos. 42 (Defendant's Remedies Memorandum), 45 (Plaintiff's Remedies Response), 47 (Defendant's Remedies Reply), 48 (Plaintiff's Notice of Supplemental Authority), 49 (Defendant's Response to Notice of Supplemental Authority). While the Department argued that the refund should be reduced to zero (or some other partial sum) because of various benefits that Resolute has gained from the Board's marketing and promotion efforts, see Mem. at 3-5, Resolute (unsurprisingly) retorted that its refund should not be subject to any offset. See Resp. at 5-7.

These memoranda opened another can of worms. In a footnote in its Reply, Defendant mentioned that "[t]he focus of Resolute's brief on the nature of the award seems to present the unanswered question [of] whether the relief it seeks would fit within the waiver of sovereign immunity." Reply at 6 n.1. The Department went on to concede that it would "not raise[] that potential bar here" but would "reserve[] the right to raise this argument in future cases." Id. The Court, sensing that this issue was jurisdictional in nature, nonetheless ordered the parties to discuss the sovereign-immunity bar. See ECF No. 50.

That additional briefing is now complete, and the Court at last turns to the question of what remedy to award Resolute.

**II.     Analysis**

The parties here start at opposite poles. Where the Department would prefer to refund none of Resolute's dues paid under the unlawful Checkoff Order, the company asks for its entire $1.1 million back. To put it plainly, because that money rightfully belonged to Resolute and not the Board, Plaintiff wants that sum returned.

That seems fair enough. After all, casebooks introduce the general theory that "where there is a legal right, there is also a legal remedy by suit or action at law, whenever that right is invaded." Marbury v. Madison, 5 U.S. (1 Cranch) 137, 163 (1803). Even if these words are sometimes true, the finer mechanics of what remedy is due are no doubt hidden in some latter-page, small-font-size footnotes. See generally Cal-Almond, Inc. v. Dep't of Agric., 67 F.3d 874, 879 (9th Cir. 1995), vacated on other grounds, 521 U.S. 1113 (1997) (explaining that "[d]espite the celebrated dictum in Marbury . . . , not every right comes equipped with a guarantee of individual remediation for every violation of that right").

Because Resolute demands money from the federal fisc, two questions must be examined: first, whether the United States' sovereign immunity bars that monetary relief as a remedy, and second, to what extent a court may (or should) trim the potential refund. This Court turns to each separately.

A. Sovereign Immunity

Much academic ink has been spilled over the "confusing doctrine of sovereign immunity." The Presbyterian Church v. United States, 870 F.2d 518, 524 (9th Cir. 1989) (quotation omitted). Broadly speaking, that doctrine starts with a baseline rule: "It is axiomatic that the United States may not be sued without its consent and that the existence of consent is a prerequisite for jurisdiction." United States v. Mitchell, 463 U.S. 206, 212 (1983). That statement extends to remedies as well, as the United States must also "[c]onsent to a particular remedy." Settles v. U.S. Parole Comm'n, 429 F.3d 1098, 1105 (D.C. Cir. 2005).

Such a consented-to waiver of sovereign immunity must be "unequivocally expressed" in a congressional statute. Hubbard v. EPA, 982 F.2d 531, 532 (D.C. Cir. 1992) (*en banc*) (quoting Mitchell, 445 U.S. at 538). Because immunity is a jurisdictional determination made by Congress, no waiver exists simply because a federal agency declines to press the defense in court. See Settles, 429 F.3d at 1105 ("Sovereign immunity may not be waived by federal agencies."); Dep't of Army v. Fed. Labor Relations Auth., 56 F.3d 273, 275 (D.C. Cir. 1995) ("[O]fficers of the United States possess no power through their actions to waive an immunity of the United States or to confer jurisdiction on a court in the absence of some express provision of Congress.") (quoting United States v. N.Y. Rayon Importing Co., 329 U.S. 654, 660 (1947)). And so, despite the Department's initial litigating position (or lack thereof), see Reply at 6 n.1, the Court must address the immunity bar here. See, e.g., Bowen v. Massachusetts, 487 U.S. 879,

888 (1988) (discussing immunity despite agency's earlier decision "not to press the defense of lack of jurisdiction in this action").

For the purposes of this case, the relevant waiver is found in the Administrative Procedure Act. See 5 U.S.C. § 702. Section 702 authorizes — from federal agencies or its officers — "relief other than money damages." See Clark v. Library of Congress, 750 F.2d 89, 102 (D.C. Cir. 1984) (commenting that § 702 "eliminate[s] the sovereign immunity defense in virtually all actions for non-monetary relief against a U.S. agency or officer acting in an official capacity"). Although the present suit arises under the CPRIA's judicial-review provision, and not under the APA, § 702's "waiver of sovereign immunity applies to any suit whether under the APA or not." Chamber of Commerce of U.S. v. Reich, 74 F.3d 1322, 1328 (D.C. Cir. 1996); see Trudeau v. FTC, 456 F.3d 178, 186 (D.C. Cir. 2006) (observing "nothing in the language of the second sentence of § 702 that restricts its waiver to suits brought under the APA").

If Resolute is asking for specific relief — *i.e.*, "relief other than money damages" — then its suit may find cover under § 702's umbrella waiver. Although that may initially seem unlikely, given that Plaintiff wants over $1 million, Resolute contends that such a refund qualifies not as "money damages," but rather as "specific relief, an equitable remedy" — namely, the remedy of "specific restitution." ECF No. 53 (Plaintiff's Supplemental Brief) at 3; Resp. at 6. In so arguing, it relies in principal part on Bowen, where the Supreme Court explained the distinction drawn in § 702:

> Our cases have long recognized the distinction between an action at law for damages — which are intended to provide a victim with monetary compensation for an injury to his person, property, or reputation — and an equitable action for specific relief — which may include an order providing for the reinstatement of an employee with backpay, or for "the recovery of specific property or monies, ejectment from land, or injunction either directing or restraining the defendant office's actions." Larson v. Domestic &

8

Foreign Commerce Corp., 337 U.S. 682, 688 (1949) (emphasis added).

487 U.S. at 893. In line with this passage, Resolute characterizes its refund as nothing more than the recovery of specific monies unlawfully assessed.

Yet this sentence alone cannot propel Resolute to the finish line. In Hubbard, 982 F.2d at 536-37, an *en banc* D.C. Circuit discussed the weight of this very passage in considering whether "back pay" qualified as specific relief. Although the Bowen quotation above mentioned that § 702's waiver covered reinstatement with back pay, see 487 U.S. at 893, this Circuit labeled that language as "dicta." Hubbard, 982 F.2d at 537. The Hubbard court elaborated that it could not "rest a general waiver of sovereign immunity as to back pay for federal employees on a single, ambiguous phrase in a background, descriptive portion of the Bowen opinion." Id. The D.C. Circuit then concluded that, *contra* Bowen, back pay did not qualify as relief other than money damages for § 702's purposes. Id. at 539.

In reaching that conclusion, Hubbard addressed arguments that back pay constituted specific relief because it was "restitutionary" in giving back money that belonged to the plaintiff in the first place. Id. at 538-39. This discussion is particularly pertinent here, as Plaintiff likewise posits that a refund would be "an equitable remedy" or "specific restitution." Pl.'s Suppl. Br. at 3; Resp. at 6. Those descriptors, however, are not dispositive. As Hubbard held, "Whether we or someone else call a remedy restitutionary, equitable or anything else, it fits within § 702's waiver only if it gives the plaintiff the specific thing to which he was originally entitled." 982 F.2d at 538 (emphasis added); see Bowen, 487 U.S. at 895. In that case, the D.C. Circuit concluded that although the plaintiff's victory on a First Amendment refusal-to-hire claim entitled him to the job itself — *i.e.*, reinstatement — no statute had further authorized the incidental relief of back pay as well. See Hubbard, 982 F.2d at 539.

9

Instead of relying on Resolute's characterizations, the Court must thus search for what the company was <u>entitled</u> to originally. In this inquiry, questions of sovereign immunity and statutory interpretation often blend together. That is, a remedy constitutes "relief other than money damages" when the suit is "seeking to enforce the <u>statutory mandate</u> itself, which happens to be one for the payment of money." <u>Dep't of Army v. Blue Fox, Inc.</u>, 525 U.S. 255, 262 (1999) (quoting <u>Bowen</u>, 487 U.S. at 900). Put another way, "[w]here a plaintiff seeks an award of funds to which it claims <u>entitlement under a statute</u>, the plaintiff seeks specific relief, not damages." <u>America's Cmty. Bankers v. FDIC</u>, 200 F.3d 822, 829 (D.C. Cir. 2000) (emphasis added); <u>see</u> <u>Hubbard</u>, 982 F.2d at 536, 538 (describing money relief as appropriate in a "suit to enforce a statutory <u>entitlement</u>" or where litigants are "statutorily entitled" to certain costs); <u>Md. Dep't of Human Resources v. Dep't of Health & Human Servs.</u>, 763 F.2d 1441, 1446 (D.C. Cir. 1985) (drawing distinction that plaintiff was "seeking funds to which a statute allegedly entitles it, rather than money in compensation for the losses").

In assessing whether such a statutory entitlement exists here, the Court addresses first some relevant examples, then the language and structure of the CPRIA, and finally the Department's statutory counterargument.

To begin, a few examples show what sort of statutory language triggers § 702's waiver. For instance, <u>Bowen</u> concerned the federal government's advance Medicaid payments to individual states and Massachusetts's claim that some of those sums were wrongfully withheld. In that case, although Massachusetts sought monetary relief, it was nonetheless able to recover because the Medicaid Act explicitly provided that the Secretary of the Department of Health and Human Services "<u>shall</u> pay" the appropriate sums. <u>Bowen</u>, 487 U.S. at 900 (emphasis added) (quoting 42 U.S.C. § 1396b(a)). Likewise, in <u>America's Community Bankers</u>, the D.C. Circuit

10

permitted a case for monetary relief to proceed because the plaintiffs maintained that the "statutory scheme . . . <u>required</u> the [agency] to provide for a[n] . . . assessment refund." 200 F.3d at 829 (emphasis added). The statute there provided that the agency's assessments "shall not exceed the amount authorized" under another section; that other section then allowed assessments "when necessary, and <u>only to the extent necessary</u>," implying an entitlement to a refund of unnecessary payments. <u>Id.</u> at 825 (emphasis added) (quoting then-applicable versions of 12 U.S.C. §§ 1441(f)(2), 1817(b)(2)(A)(i)).

The language of the CPRIA creates a similar entitlement. The Act first authorizes the Softwood Lumber Board "to administer the order in accordance with its terms and conditions and to collect assessments." 7 U.S.C. § 7414(c)(1). In carrying out this duty, there is a limit to what may be collected — namely, "[a]ssessments <u>required</u> under an order shall be remitted to the board." <u>Id.</u> § 7416(b) (emphasis added). By logical extension, if a checkoff order is unlawful, then it cannot be fairly said that any assessments would actually be <u>required</u> under that order. That is, the Board has a duty to collect only lawful, requisite assessments, and, conversely, industry members are <u>entitled</u> to the sums that they need not have paid. <u>See</u> <u>America's Cmty. Bankers</u>, 200 F.3d at 825, 829 (construing statute that requires assessments "only to the extent necessary" as a statutory entitlement for payers).

Telling, too, are the Act's review procedures. Any person subject to an order may lodge a challenge with the Secretary not only to the lawfulness of the order itself but also to "any obligation imposed in connection with the order." 7 U.S.C. § 7418(a)(1)(A). This ability to challenge a specific "obligation" already imposed strongly implies that the CPRIA contemplates a procedure to recover any assessments later found unlawful. Judicial review of these administrative proceedings is then broad, as the Act authorizes a district court to direct the

Secretary to fulfill any statutory duties — *e.g.*, to keep only "required" assessments. Id. § 7416(b); see id. § 7418(b)(3) (authorizing court to direct Secretary to "take further action as, in the opinion of the court, the law requires"). Indeed, Resolute's challenge began with such a petition, filed in 2011 and challenging the lawfulness of the Checkoff Order under the CPRIA. See Compl., ¶¶ 81-82.

Finally, specific features of the CPRIA's structure support the conclusion that companies are entitled to a refund of unlawful assessments. The Supreme Court has once addressed the framework of the similar Agricultural Marketing Agreement Act of 1937, 7 U.S.C. § 601 *et seq.*, which also contemplates promotional "projects to be paid from funds collected pursuant to the marketing order" and permits administrative petitions challenging "any obligation imposed in connection therewith is not in accordance with law." Id. § 608c(6)(I), (15)(A) (emphasis added); see United States v. Ruzicka, 329 U.S. 287 (1946); see also ECF No. 52 (Defendant's Supplemental Brief) at 3 n.1. Under that Act, the Secretary, through marketing orders, can likewise require companies to pay assessments to industry boards to fund advertising campaigns. Ruzicka held that if a person did not pay because she believed the order to be unlawful, the Secretary could immediately enforce the order by seeking assessments in district court. See 329 U.S. at 289-90. But in those enforcement proceedings, Ruzicka concluded, the individual could not raise the defense that the order was unlawful; instead, her only route would be to submit a separate petition for administrative (and, ultimately, judicial) relief. Id. at 291-94.

Underneath the surface of this enforcement/petition structural counterpoint is an assumption about refunds. Companies would need to pay assessments (or risk enforcement) until they succeeded in their petition. See id. at 293 ("To make the vitality of the whole arrangement depend on the contingencies and inevitable delays of litigation, no matter how

12

alertly pursued, is not a result to be attributed to Congress unless support for it is much more manifest than we here find."); Navel Orange Admin. Comm. v. Exeter Orange Co., 722 F.2d 449, 452 (9th Cir. 1983). Although the Ruzicka Court could have been disturbed by this pay-to-litigate structure, it was not. Instead, it presumed that upfront-payment inequities would be fixed: "Congress explicitly gave to [that] aggrieved handler an appropriate opportunity for the correction of errors or abuses by the agency charged with the intricate business of milk control." 329 U.S. at 292 (emphasis added). In other words, if the petitioner won in the end, the unlawful assessments could be undone. See Saulsbury Orchards & Almond Processing, Inc. v. Yeutter, 917 F.2d 1190, 1195 (9th Cir. 1990); United States v. Riverbend Farms, Inc., 847 F.2d 553, 559 n.7 (9th Cir. 1988).

Other Agricultural Marketing Agreement Act decisions (outside the narrow realm of milk marketing) confirm this interpretation. In a line of cases addressing First Amendment challenges to marketing orders, the Ninth Circuit has held that the marketing statute indeed contemplates a refund. That Circuit first held that "a sufficient remedy for handlers who prevail in their administrative petitions is a refund of any assessments found not to have been due." Cal-Almond, Inc. v. U.S. Dep't of Agric., 14 F.3d 429, 448 (9th Cir. 1993). Later cases then confirmed that such refund constituted specific relief not barred by sovereign immunity. See Wileman Bros. & Elliott, Inc. v. Espy, 58 F.3d 1367, 1386 (9th Cir. 1995); see also Cal-Almond, 67 F.3d at 878 n.1 ("The USDA does not, and indeed could not, contend that refund of assessments paid to the Board would be damages and therefore barred by sovereign immunity."). So long as this monetary relief was truly a refund from the board — and not a reimbursement for money spent elsewhere — plaintiffs could obtain money as a remedy. See Cal-Almond, 67 F.3d

13

at 879 ("[I]t matters a great deal whether the recovery would require the USDA to reimburse the handlers for money they paid to third parties because of the doctrine of sovereign immunity.").

The CPRIA shares a similar structure. If a company does not pay, the Secretary may seek to enforce the assessments in district court. See 7 U.S.C. § 7419(a). At the same time, that company may proceed separately to obtain administrative (and then judicial) relief for its marketing-order obligations. See id. § 7418(a)-(b). As with the Agricultural Marketing Agreement Act, however, a petition to review an assessment would not halt any enforcement proceedings — industry members would still need to pay under protest. See id. § 7418(c) ("The pendency of a petition . . . shall not operate as a stay of any action . . . to enforce this subchapter . . . ."). Implied in the CPRIA's analogous framework, then, must be the same assumption that if a company succeeds, all will be made right in the end, as it would be entitled to a refund. See Ruzicka, 329 U.S. at 292 ("Congress explicitly gave to [that] aggrieved handler an appropriate opportunity for the correction of errors or abuses by the agency . . . .").

The Department's sole argument in opposition rests on an exception to the § 702 waiver. In certain statutory schemes, the waiver is ineffective because the law at issue "expressly or impliedly forbids the relief which is sought." 5 U.S.C. § 702. Defendant here concedes that a long line of cases has found that the Agricultural Marketing Agreement Act is not one of those statutes and does not in any way forbid a refund. See Def.'s Suppl. Br. at 9. Yet, the agency contends, the CPRIA is different because its judicial-review provision does not mention refunds and only vaguely empowers district courts to direct the Secretary "to take such further action as, in the opinion of the court, the law requires." 7 U.S.C. § 7418(b)(3)(B). This supposed distinction, however, is unpersuasive. Closer inspection reveals that the Agricultural Marketing

Agreement Act is substantively the same, as it, too, permits courts to direct the Secretary "to take such further proceedings as, in its opinion, the law requires." Id. § 608c(15)(B).

As there appears to be no way to distinguish this refund case from the plethora of others relating to marketing orders, the Court concludes that sovereign immunity does not bar a refund, as that relief falls within the scope of § 702's waiver.

B. Refund Amount

In addition to the question of whether the Court may direct a refund, the parties also dispute what refund is due. To remind the reader, the CPRIA outlines the Court's authority here:

> If the court determines that the ruling is not in accordance with law, the court shall remand the matter to the Secretary with directions —
>
> **(A)** to make such ruling as the court determines to be in accordance with law; or
>
> **(B)** to take such further action as, in the opinion of the court, the law requires.

7 U.S.C. § 7418(b)(3).

Resolute asks the Court to direct the Secretary to issue a full refund. See id. § 7418(b)(3)(B). In this vein, because the Act demands that only assessments "required under an order" should be paid, id. § 7416(b) (emphasis added), it creates entitlement to a refund of any unlawful ones. Resolute warns, however, that any deductions would turn its request for the return of specific assessments into a demand for partial compensation, which would be barred by sovereign immunity as simply money damages. See Resp. at 6; see also Cal-Almond, 67 F.3d at 879. In response, the Department argues that the Act specifically contemplates that the Court may wield its equitable discretion to deduct or erase any sums owed. See 7 U.S.C. § 7418(b)(3)(B) (permitting "such further action as, in the opinion of the court, the law requires") (emphasis added).

15

The Court finds Defendant's position unconvincing. First off, it is not clear that equity would grant such broad power at all. With equity, there is a "'flexibility' inherent in 'equitable procedure' [that] enables courts 'to meet new situations [that] demand equitable intervention, and to accord all the relief necessary to correct . . . particular injustices.'" Holland v. Florida, 560 U.S. 631, 650 (2010). "The qualities of mercy and practicality have made equity the instrument for nice adjustment and reconciliation between the public interest and private needs as well as between competing private claims." Hecht Co. v. Bowles, 321 U.S. 321, 329-30 (1944). Yet some courts have suggested that when a party asks for specific relief in the form of a refund, the Court cannot, even in equity, order something "other than the specific return of funds." Cobell v. Kempthorne, 569 F. Supp. 2d 223, 245 (D.D.C. 2008), vacated on other grounds sub nom., Cobell v. Salazar, 573 F.3d 808 (D.C. Cir. 2009).

In any event, even assuming the Court <u>can</u> equitably modify the refund, it will not. While Defendant offers four principal reasons why the refund amount should be discounted or reduced to zero, none is persuasive.

The Department first points to a number of specific research and promotion programs funded by the assessments that allegedly have benefited Resolute. See Mem. at 6-8. No doubt these initiatives appear to have furthered the softwood-lumber industry in a general sense. See ECF No. 42-4 (2015 Annual Report). Yet the Department points to no evidence that these benefits have specifically redounded to Resolute's favor. In fact, the company's President and CEO informed the Court that Resolute instead "pursues its own marketing strategies" and had "no plans to spend money" on the Checkoff Order's types of promotions in the future, as that spending appeared unnecessary under Resolute's specific business circumstances. See ECF No. 45-1 (Declaration of Richard Garneau), ¶¶ 3, 7-8.

16

In related fashion, Defendant next offers data on company profits. It logs that lumber companies have experienced $15.55 of additional sales (resulting in $6.73 of additional investor profit) for each $1 spent by the Board. See ECF No. 42-6 (Declaration of Douglas Adams), ¶ 20. These galactic gains have purportedly been the result of bolstered demand due to the Board's efforts. Id. But when something sounds too good to be true, read the fine print. Although the Department reports that architects and engineers with significant interactions with the Board's promotional programs purchased significantly more softwood lumber from industry members, it also mentions that those persons or firms with "minimal involvement" actually bought less. Id., ¶ 19. Defendant does not suggest, however, that Plaintiff's clients could or did have any involvement with any specific programs.

Third, the Department presses that Resolute should not be permitted to be a free rider on the Board's programs. See Mem. at 10. It first bears noting that this free-rider problem is a limited one, as the time period for challenging an assessment under the Checkoff Order has long passed, and no other companies appear to have asked for a refund. See 7 U.S.C. § 7418(a)(4). The only potential free rider, consequently, is Resolute, who, as mentioned above, does not consider itself to have benefited from the Order at all. In addition, very little about this process has been "free" to Plaintiff: The Board has held onto Resolute's annual payments for a number of years, and Resolute has expended significant resources litigating this matter to its completion. Considered in a broad sense, moreover, there are any number of "free riders" on programs that benefit the lumber industry. With buildings built and timber sawn, insulation, paint, and termite-control companies all must derive some benefit. This argument is thus not one that gains traction for the Government.

Defendant last contends that the proper refund (if any) should be doled out after it promulgates a new Checkoff Order establishing revised assessment rates, which it is now "in the process" of doing. See Mem. at 10-11; see also ECF No. 49 (reporting that the Department is "diligently working on [its] economic analysis"). That is, the Department would refund only the difference between what Resolute did pay and what it should have paid were the soon-to-be-established lawful order retroactively applied. Alas, this Rubicon has been crossed. In fact, Caesar has long since been crowned. This Court has already twice permitted Defendant to "try, try, try again." Resolute III, 2016 WL 2885869, at *19 (citing Resolute II, 2016 WL 1714312, at *3); see Resolute I, 130 F. Supp. 3d 81. To no avail. After two exercises in futility, this Court's third, most recent Opinion held decisively that the Checkoff Order was promulgated unlawfully. See Resolute III, 2016 WL 2885869, at *19. The chance to formulate a lawful Checkoff Order is long gone.

Defendant's wait-and-see solution, albeit creative, is also not feasible. Although the promise of a new order sounds enticing, will it be approved by lumber producers, will it be correct this time, and how many more rounds of challenges will be necessary? The Court is not in a position to continue to monitor the administration of softwood-lumber programs for years to come. Cf. Norton v. S. Utah Wilderness Alliance, 542 U.S. 55, 67 (2004) ("The prospect of pervasive oversight by federal courts over the manner and pace of agency compliance with such congressional directives is not contemplated by the APA."). And for Plaintiff to wait and wait is by no means a satisfying solution. Resolute's challenge to the Checkoff Order has already spanned half a decade. By now, the Court is ready to call game, set, match.

All told, the Department simply has offered no viable way for the Court to split the refund on the chopping block, and so a full one shall issue.

### III.    Conclusion

For these reasons, the Court will remand the case and direct the Secretary to issue Plaintiff a full refund of its assessments under the Softwood Lumber Checkoff Order. A separate Order so stating will issue this day.

/s/ *James E. Boasberg*
JAMES E. BOASBERG
United States District Judge

Date:  November 30, 2016